# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 10-2888

_____

| | |
|---|---|
| Hamid Amini, | * |
| | * |
| Appellant, | * |
| | * Appeal from the United States |
| v. | * District Court for the |
| | * District of Minnesota. |
| City of Minneapolis, a municipality, | * |
| | * |
| Appellee. | * |

_____

Submitted: March 15, 2011
Filed: July 5, 2011

_____

Before WOLLMAN, MURPHY, and GRUENDER, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

After the City of Minneapolis did not hire Hamid Amini for a position with the Minneapolis Police Department, Amini, who was born in Afghanistan, filed suit, alleging that the City discriminated against him based on his race, color, and national origin, in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. The district court[1] granted summary judgment in favor of the City. We affirm.

_____

[1]The Honorable Donovan W. Frank, United States District Judge for the District of Minnesota.

## I.  Background

### A.  The Hiring Process

The police department announces officer vacancies on the City's website.  To be considered, candidates must complete an application for employment.  The candidates are also encouraged to complete a voluntary confidential information form, which asks about their race and gender, among other things.  The form is not shared with the hiring decision-maker.

The human resources department reviews and scores the applications.  If the candidates meet the minimum qualifications, they earn seventy points.  Candidates earn additional points for other criteria, like work experience, and the scores are used to determine whether the candidates will be invited to complete fitness testing.  If they pass the fitness test, the candidates may then complete an oral examination.  The City describes the oral examination as a structured interview to evaluate qualities such as knowledge, judgment, decision-making ability, integrity, human relations, customer service, and oral communication skills.  The results from the fitness test and the oral examination are weighted and added together, with veteran's preference points added to the scores of qualified candidates.  Finally, the overall scores are ranked and the candidates are placed on the "eligible list."  Depending on the police department's needs, a certain number of candidates listed on the eligible list proceed to the background investigation phase.  Minnesota law requires that background investigations be conducted on peace officer candidates.  Minn. Stat. § 626.87.

The background investigation phase lasts approximately twelve weeks.  The candidates complete an extensive questionnaire, and a background investigator is randomly assigned to each candidate.  The investigator reviews the questionnaire, runs database checks, and requests information from the candidate's references, educational institutions, and former employers.  The investigator might also visit the

candidate's home or employer. Thereafter, the investigator interviews the candidate about his background and prepares a summary of the investigation. The summary does not include the candidate's name, age, gender, race, ethnicity, or national origin. Instead, candidates are assigned an identification number. The summaries are provided to the hiring board, also known as the roundtable panel, usually about a week or so before the panel convenes to discuss the candidates.

The panel is composed of members of the human resources department and high ranking members of the police department's administration. During the roundtable meeting, the panel discusses the candidates by their identification numbers. The panel relies on the background summaries to determine which candidates would be a "good fit" for the police department. Each candidate is given a recommendation of select, non-select, or select with reservations, and the recommendation is recorded on a tally sheet. The tally sheet, along with background summaries that show the candidate's name and corresponding identification number, are forwarded to the police chief or the designated final decision-maker.

After the police department determines how many candidates it intends to hire, human resources certifies the number of intended hires plus two[2] to the administration. From that list, the police chief or the chief's designee makes conditional job offers to the number of candidates they intend to hire. The candidate must then pass physical and mental examinations before the department extends a final job offer.

---

[2]The police department applies the so-called "rule of three," meaning that if the department intends to hire one officer, human resources would certify a list of the top three candidates. If the department intends to hire five officers, the top seven candidates are certified.

## B. Amini's Interview Process

In May 2006, the Minneapolis police department posted job openings for police officers, and Amini submitted an application. His application indicated that he graduated from high school in Kabul, Afghanistan, and that he had lived in New Delhi, India.

Amini's application was awarded eighty-six points out of one hundred for his training and experience. Amini was invited to complete the fitness test and oral exam, which he did. Amini's overall score was 83.98, and he ranked sixty-third out of the eighty-three candidates on the eligible list. The top forty-nine candidates proceeded to the background phase. Given his rank, Amini was not among them, but he and the other candidates remained on the eligible list until it expired in October 2006, or until they were disqualified or invited to proceed in the hiring process.

In September 2006, the police department sought to hire additional police officers. The human resources department invited the remaining candidates from the previously compiled eligible list—those ranked fifty through eighty-three—to participate in background investigations. Amini submitted his background questionnaire, answering "no" to the following two questions: (1) "Were you ever named as a suspect, arrested or listed as an arrested person in a police report?" and (2) "Were you ever subjected to disciplinary action in connection with any employment?"

Officer Amy Caspers conducted Amini's background investigation. She learned that Amini had been listed as a suspect in a fifth degree assault in 1994. The public data from the police report read in part:

> Victim and suspects had an argument over a parking space on the street.
> Victim parked his car and the suspects became mad and called the

victim names and pulled his hair. Victim was able to obtain suspect #1's license plate number. Victim worked with security personnel in gathering suspect info.

Caspers also discovered two written reprimands in Amini's employee file with Wackenhut Security.

Caspers conducted Amini's background interview. Officer Kara Peterson attended the interview, which was audio recorded. At the beginning of the interview, Caspers told Amini that if he forgot to document something in his application he could provide the information during the interview. When asked whether there was anything he forgot to document, Amini responded, "No." Caspers later asked Amini if he had ever received any verbal or written reprimands from his employers. Amini answered that he had not, whereupon Caspers inquired about the two written reprimands on file with Wackenhut Security. Although Amini initially indicated that he did not remember the reprimands, he later stated that he remembered the incidents but believed that he had not received any written reprimands.

When Caspers asked whether Amini had had any contact with a law enforcement agency, he replied that he had not. Caspers asked about the 1994 police report that named him as a suspect. Amini responded that his brother had argued with the person who had made the complaint. Amini said that he was present, but that he was not involved in the dispute. After approximately two minutes of discussion, Caspers explained, "This is twelve years ago. I'm telling you you're listed as a suspect. It doesn't matter what happened back then, but I'm asking for any contact. You have had contact with a police officer that day." Amini responded, "No. I didn't." After Amini called the police report "absurd," Peterson asked, "Why is this absurd?" Amini said, "Because this never hap—I wasn't involved. . . ." According to Amini, "There were no police involved [in the dispute]."

-5-

Near the end of the interview, Amini revisited the topic of the reprimands and the police report. After some discussion, Amini said, "If I was aware of [the written reprimands], I would tell you, 'I was reprimanded, so what's the big deal?'"

> Caspers: I understand that you're mad at Wackenhut [Security] because you have these reprimands in your file, but don't get defensive and don't start saying it's not a big deal. Because this is your final step to get where you want to go with the police department. . . .
>
> Amini: I wouldn't hide it.
>
> Caspers: I'm not saying you would hide it. But it is a big deal to us the way you are reacting. And the way you are reacting to this is kind of a big deal. . . . You don't have to fight with me about what I find on you.

The next day, Amini called Caspers to apologize "if [he] overreacted." He explained that his son had broken his arm, he had not slept in two days, and he had come to the interview after working the night shift.

Caspers prepared an eighteen-page summary on Amini, setting forth the results of her investigation. The summary identified Amini only by candidate number; it did not list his name, national origin, race, or color, although it did note that he had lived in Afghanistan and India. The final paragraph of the conclusion provided:

> When the candidate was shown the documentation regarding the two written reprimands from his/her employment with Wackenhut and the police report regarding the Assault 5, the candidate became very defensive, agitated and argumentative. The candidate wanted these items removed from his/her background investigation since he/she stated he/she did not know about the reprimands and called the police report absurd[.] On December 29, 2006, the candidate left a voice mail regarding his/her behavior during the interview. The candidate stated

he/she overreacted because he/she had not been sleeping well and a family member had been involved in an accident.

The background investigation summaries of the thirty-four candidates were provided to the roundtable panel for consideration. At a meeting in February 2007, the panel evaluated each candidate and assigned recommendations, which were recorded on a tally sheet. Amini received a recommendation of non-select.

The tally sheet, along with the background investigation summaries and the background questionnaires for all thirty-four candidates, was given to deputy chief Scott Gerlicher and assistant chief Sharon Lubinski.[3] Because the police department intended to hire ten officers, human resources certified the list of the top twelve candidates, based on their original rank on the eligible list. Ten of the candidates had received the select recommendation from the panel. Less than an hour after receiving the list, Lubinski chose to extend conditional offers to those ten candidates. Lubinski later testified that she relied heavily upon the recommendation of the panel, and she recalled reading the conclusion from Amini's background investigation summary. Amini, who was ranked second on the certified list of eligible candidates but had received a recommendation of non-select, was later notified that he had not been selected for the police officer position.

Amini filed a complaint with the U.S. Equal Employment Opportunity Commission (EEOC) alleging discrimination based on his national origin. In response, the City listed the following reasons for its hiring decision: Amini failed to disclose that he was named as a suspect in the fifth degree assault complaint and that he had a gun permit; he received two written warnings from his current employer; and he resigned in lieu of involuntary termination from a previous employer. Moreover, the response quoted the conclusion of Amini's background investigation summary and stated, "Mr. Amini's demeanor in response to the investigators' reasonable inquiry is

_____

[3]Lubinski typically informed Gerhlicher of the candidates she intended to hire.

inconsistent with the expected temperament for a peace officer and influenced the [Minneapolis Police Department's] decision not to offer him employment."

## II. Discussion

We review *de novo* the district court's grant of summary judgment, viewing the evidence in the light most favorable to the nonmoving party. Torgerson v. City of Rochester, No. 09-1131, 2011 WL 2135636, *7 (8th Cir. June 1, 2011) (en banc).[4] Summary judgment is appropriate if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 252 (1986).

Amini alleges that the City discriminated against him based on his race, color, and national origin.[5] Title VII provides that it is an unlawful employment practice for an employer to fail or refuse to hire any individual "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "[a]ll persons within the jurisdiction of the United States shall have the same right . . . to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981. Claims under Title VII and § 1981 are analyzed under the same standards. Lake v. Yellow Transp., Inc., 596 F.3d 871, 873 n.2 (8th Cir. 2010).

---

[4]Torgerson held that there is no discrimination case exception to the application of summary judgment, abrogating the standard of review applied in Dixon v. Pulaski County Special School District, 578 F.3d 862, 867 (2009), and Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 850 (8th Cir. 2005), among others.

[5]Like the district court, we have read Amini's complaint broadly as stating a claim for race discrimination under § 1981.

The parties agree that we must analyze Amini's discrimination claim under the burden-shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973). Under this framework, Amini must first establish a prima facie case of discrimination based upon his race, color, or national origin. <u>Torgerson</u>, 2011 WL 2135636, at *11. To do so, Amini must show that he is in a protected class, that he was qualified for an open position, that he was denied that position, and that the employer filled the position with a person not in the same protected class. <u>Id.</u> The burden then shifts to the City to articulate a legitimate, nondiscriminatory reason for not hiring him. <u>Id.</u> Once the City proffers such a reason, the burden then shifts back to Amini to show that "the legitimate reasons offered by [the City] were not its true reasons, but were a pretext for discrimination." <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000). "Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant discriminated against the plaintiff remains at all times with the plaintiff." <u>Id.</u>

The City contends that Amini did not establish a prima facie case because he was not qualified for the officer position. Amini, however, satisfied the City's criteria to be placed on the eligible list and was ranked second among the twelve candidates certified to the hiring decision-maker. Moreover, his application shows that he had relevant work experience, spoke five languages, was college educated, and maintained appropriate certifications. Viewing the evidence in the light most favorable to Amini, we conclude that he was qualified for the position. <u>See</u> <u>Torgerson</u>, 2011 WL 2135636, at *11 ("The burden of establishing a prima facie case of disparate treatment is not onerous."). Amini has met the remaining requirements to make his prima facie showing, and thus the burden shifts to the City.

The City has articulated a legitimate, nondiscriminatory reason for its decision to not hire Amini: It had serious concerns about his temperament. <u>See</u> <u>id.</u> at *12 ("The burden to articulate a nondiscriminatory justification is not onerous."). To the

extent Amini argues that Lubinski and the panel should not have considered temperament in making the hiring decision, we find the argument to be without merit. Lubinski testified that during an arrest, "the ability to have an even temperament and [remain] cool under pressure is really critical both in terms of . . . getting through that situation safely, arresting someone, and keeping . . . the officer safe and keeping the citizen safe." Lubinski said that for "a candidate for a police job to become agitated during a background interview doesn't bode well for how that person is probably going to be able to withstand verbal criticism when answering 911 calls." Accordingly, the City has met its burden under the McDonnell Douglas framework.

Our analysis thus turns to whether Amini presented sufficient evidence to create a genuine dispute of material fact that the City's proffered reason was mere pretext for discrimination. We conclude that Amini failed to meet his burden.

Amini argues that the City's explanation for its hiring decision was false. A plaintiff may show that the employer's stated reason is pretext for discrimination by showing "that the employer's proffered explanation is unworthy of credence because it has no basis in fact." Torgerson, 2011 WL 2135636, at *12. Amini maintains that he did not display an inappropriate temperament during his background interview and that Caspers's unfair characterization affected the roundtable panel's decision to deem his application non-select and Lubinski's decision to forego hiring him. The audio recording of the interview, however, reveals that Caspers's report that Amini became "very defensive, agitated and argumentative" when presented with the reprimands and the police report was not an unfair description of Amini's responses during the interview. Amini's post-interview call to Caspers to apologize if he had overreacted is corroborative of Caspers's characterization of Amini's temperament. Accordingly, we cannot say that the City's proffered reason had no basis in fact.

The focus of Amini's claim is that Caspers had a discriminatory motive, that she discriminated against him in the way she conducted his background investigation,

-10-

and that her bias infected both the interview and the written summary, causing the decision-maker to forego hiring Amini.[6] For Caspers's alleged discriminatory motive and conduct to be a triable issue, Amini would have to "substantiate his allegations with sufficient probative evidence that would permit a finding in his favor based on more than mere speculation, conjecture, or fantasy." See Putman v. Unity Health Sys., 348 F.3d 732, 733-34 (8th Cir. 2003). He has failed to do so, for there is no evidence that Caspers discriminated against Amini based on his race, color, or national origin.

Amini next argues that the City's failure to follow its policy of considering candidates' temperament or its unequal application of the policy constitutes evidence of pretext. See Dixon v. Pulaski Cnty. Special Sch. Dist., 578 F.3d 862, 871 (2009) (recognizing that in some circumstances "an employer's violation of its own policies may be indicative of pretext"). Amini cites evidence from other candidates' files showing that those candidates might have temperaments ill-suited for police work. He also quotes Lubinski's testimony that Amini's temperament was a very important consideration in her hiring decision. This case, however, does not present a question about an employer's discriminatory application of a policy. Rather, Amini's exchange with Caspers brought his temperament into question and resulted in Caspers's remarks in the conclusion of the background summary.

Amini contends that he was treated less favorably than similarly situated Caucasian candidates and that the disparate treatment is evidence of the City's discriminatory motive. See Rodgers v. U.S. Bank, N.A., 417 F.3d 845, 853 (8th Cir. 2005). Amini, however, is not similarly situated to the other candidates. At the pretext stage, "the test for determining whether employees are similarly situated to a

---

[6]If a non-decision-maker performs an act motivated by a discriminatory bias that is intended to cause, and that does proximately cause, an adverse employment action, then the employer is liable under the cat's paw theory of liability. Staub v. Proctor Hosp., 131 S. Ct. 1186, 1194 (2011).

plaintiff is a rigorous one," requiring the plaintiff to show that he and the other candidates are "similarly situated in all relevant respects." Id. Amini set himself apart from the other candidates through his reaction to the written reprimands and police report during the background interview. Accordingly, although he seeks to be compared with the candidates who received conditional job offers—arguing that some of those candidates had anger management problems and that their temperaments did not have a negative impact on their applications—he has failed to show that those candidates were similarly situated in all relevant respects. There is no evidence that the City overlooked the temperaments of other candidates who had a similar reaction when presented with information that was unfavorable or surprising.

Amini's contention that the City has shifted its reasons for not hiring him is without merit. He argues that the City's response to the EEOC reveals that it was not his temperament that served as the basis for the City's decision, but rather his failure to disclose information, the two written reprimands from his current employer, and his 1999 resignation in lieu of termination from a previous employer. Although the City's response set forth those reasons, it went on to quote the passage from the background summary that Amini became "very defensive, agitated, and argumentative" and concluded that "Mr. Amini's demeanor in response to the investigators' reasonable inquiry is inconsistent with the expected temperament for a peace officer and influenced the MPD's decision not to offer him employment." We see no significant changes in the legitimate reason the City has proffered. See Rodgers, 417 F.3d at 855 ("While it is true that substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext, this does not mean that an employer cannot elaborate on its proffered reason." (internal quotation and citations omitted)).

Amini challenges the City's use of subjective criteria in the hiring process, particularly at the background investigation phase. While "[w]e have cautioned against the use of subjective considerations because they are easily fabricated,"

-12-

Chambers v. Metro. Prop. and Cas. Ins. Co., 351 F.3d 848, 858 (8th Cir. 2003), the mere use of subjectivity in the hiring process is not itself discriminatory. In this case, Amini scored better than most Caucasian candidates in the fitness test and oral examination. He also spoke multiple languages and was college educated. But, in light of Amini's interview performance, we cannot say that the City chose clearly less qualified or unqualified candidates. The objective qualifications of the candidates were comparable, and Amini was unable to cast doubt on the justification offered by the City. He has identified no evidence that discrimination took place. Accordingly, "the use of this subjective consideration in this case does not give rise to an inference of discrimination." Id.

## III. Conclusion

The judgment is affirmed.

_____