# United States Court of Appeals
## For the Eighth Circuit

_____

No. 13-2156
_____

Jane Doe

*Plaintiff - Appellant*

v.

Sammy Hagar

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Northern District of Iowa, Waterloo

_____

Submitted: June 12, 2014
Filed: August 28, 2014

_____

Before LOKEN, BRIGHT, and GRUENDER, Circuit Judges.

_____

BRIGHT, Circuit Judge.

Plaintiff-appellant Jane Doe appeals the district court's grant of summary judgment of dismissal in favor of defendant-appellee Sammy Hagar, a well-known rock musician. After meeting in 1983, Doe and Hagar engaged in a romantic relationship spanning several years. In 1988, Doe became pregnant and believed that Hagar was the father of her child. Hagar denied paternity. Doe gave birth in February 1989 and the child died soon thereafter. Twenty-two years later in 2011,

Hagar published an autobiography in which he alleged that Doe had extorted him by claiming she was pregnant with his child. Doe brought suit against Hagar in Iowa state court alleging various causes of action, including libel per se. Hagar removed the case to federal district court and moved for summary judgment, which the district court granted on all of Doe's claims. Doe appeals. Having jurisdiction under 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand.

## I.    Background

Viewing the evidence in a light most favorable to Doe and affording her all reasonable inferences, *see Marlowe v. Fabian*, 676 F.3d 743, 746 (8th Cir. 2012), the material facts are as follows.

From 1982 to 1985, Doe worked as a Playboy bunny at the Lansing, Michigan, Playboy Club. Doe first met Hagar in 1983 through Ed Leffler, Hagar's manager, while Hagar was touring as a solo musician. After Doe became acquainted with Hagar, she was often invited to attend Hagar's concerts. From 1983 to 1988, Doe and Hagar engaged in a romantic relationship despite seeing each other infrequently during that time.

In June 1988, Leffler invited Doe to attend one of Hagar's upcoming concerts in Detroit. At the time, Hagar was the lead singer of the band Van Halen. Doe met Hagar at a restaurant in Detroit where Hagar gave her his room number and told her to contact him. Later that night, Doe went to Hagar's room and the couple engaged in sexual intercourse. Three months later, Doe called Leffler to inform him that she was pregnant with Hagar's child. Hagar denied that he was the father. Doe's close family and friends knew of her relationship with Hagar and of Doe's belief that Hagar was the father of the child.

Doe hired an attorney in the summer of 1988 to assist her in obtaining child support. The parties negotiated an agreement (the "Agreement") whereby Hagar would provide Doe a certain amount of financial assistance in exchange for Doe's silence as to her belief of Hagar's paternity. Doe also promised to submit the child for paternity testing within six months of birth. The Agreement prohibited both Hagar and Doe from disclosing its existence or its terms. Doe and Hagar signed the Agreement on February 17, 1989. Doe contends that she received a total of $7,000 from Hagar.

Near the end of her pregnancy, Doe returned to Iowa to live with her family. On February 27, 1989, she gave birth to her child. No paternity tests were ever performed. The child died a few days later on March 4, 1989.

Twenty-two years later, in March 2011, Hagar released his autobiography entitled *Red: My Uncensored Life in Rock* ("*Red*"). Hagar hired journalist Joel Selvin to write the book, which is based on interviews Selvin conducted with Hagar. More than 280,000 copies of the book have been sold worldwide. On pages 116 and 117 of *Red*, Hagar recounts his memories of Doe:

> On the tour, there was a former Playboy bunny from California hanging around, who used to see one of the other guys in my old band. Somehow she hooked up with Leffler, although she had always been after me. She was good-looking, but there was just something about this chick that was not to be trusted. She saw my name on Leffler's rooming list and came knocking at my door in the middle of the night in Detroit. I answered the door without any clothes—I sleep naked—and she pushes the door open, throws me on the bed, and starts blowing me. That's kind of tough to get up and walk away from. "Son of a bitch," I was thinking, "I'm fucked now." And sure enough, I was.
>
> About ten days later, Leffler gets the phone call. She's pregnant. I smelled a setup. I was so pissed off. Betsy would commit suicide. We hired an attorney and started dealing with her. I knew it was not my baby. It was extortion.

She wanted an apartment in New York and anything for that kid that my children would have. I didn't want to pay a penny, but Leffler convinced me the smart thing to do was give her the money until the baby was born and see what happened at that point. She was living with her boyfriend, a musician in New York, in the apartment when she had the baby. She called Leffler from the hospital. "Tell Sammy to call me," she said. I didn't want to, but Leffler talked me into it. She tells me the baby is so cute, looks just like me, she's madly in love with me, she's so sorry, shit like that.

A couple days later, Leffler gets another call. The baby died. I don't believe she ever had a baby. She may have had an abortion early on. Marshall Lever, my psychic with the sleeping dog, told me about it. "It's not your baby," he said. "She's living with her boyfriend in New York. She has a boyfriend that's a musician and this is probably an extortion case. Don't worry, just relax, and once she has the baby, it's all going to go away."

I never heard from her again. Obviously, it wasn't my baby, and they knew it. They just extorted me as long as they could. No one ever saw her again.

Doe contends that Hagar's characterization of her as a schemer and criminal is false. After release of the book, Doe informed certain friends and family that she was mentioned in *Red* so they would not think that Hagar's statements were true when they read the passage themselves.

In October 2011, Doe sued Hagar in Iowa state court alleging various causes of action. Hagar removed the case to federal district court based on diversity of citizenship. In April 2013, the district court granted Hagar's motion for summary judgment with respect to all of Doe's claims. The district court entered judgment in favor of Hagar and Doe filed a timely notice of appeal.

## II. Discussion

On appeal, Doe claims that the district court erred in granting summary judgment on her claims of libel per se, false light invasion of privacy, intentional infliction of emotional distress, breach of contract, and breach of the duty of good faith and fair dealing.

"We review a grant of summary judgment de novo, applying the same standard as the district court." *Naucke v. City of Park Hills*, 284 F.3d 923, 927 (8th Cir. 2002). "Summary judgment is appropriate when the evidence viewed in the light most favorable to the nonmoving party presents no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Coates v. Powell*, 639 F.3d 471, 475 (8th Cir. 2011). "A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party; a fact is material if its resolution affects the outcome of the case." *Amini v. City of Minneapolis*, 643 F.3d 1068, 1074 (8th Cir. 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986)).

We apply Iowa law to Doe's claims of libel per se, false light invasion of privacy, and intentional infliction of emotional distress. *See Urban Hotel Dev. Co. v. President Dev. Grp., L.C.*, 535 F.3d 874, 877 (8th Cir. 2008) (noting that a court of appeals "applies the substantive law of the state in which the district court sits"). Pursuant to the choice-of-law provision in the parties' Agreement, we apply New York law to Doe's claims of breach of contract and breach of the covenant of good faith and fair dealing. *See John T. Jones Constr. Co. v. Hoot Gen. Constr. Co.*, 613 F.3d 778, 783 (8th Cir. 2010) (explaining that "[o]nce the existence of a contract is determined, . . . we will apply [the law of the forum chosen by the parties] to questions of interpretation or construction of the contract"). We review de novo the district court's interpretation of state law in a diversity suit. *Urban Hotel Dev. Co.*, 535 F.3d at 877.

We now address Doe's claims on appeal.

## A. Libel Per Se

Doe first argues that the district court erred by granting summary judgment in favor of Hagar on her claim of libel per se. We agree.

Iowa courts recognize two types of libel: "libel per se and libel per quod." *Schlegel v. Ottumwa Courier, Inc.*, 585 N.W.2d 217, 222 (Iowa 1998). To establish a prima facie case of libel per quod, "the plaintiff must show the defendant '(1) published a statement that (2) was defamatory (3) of and concerning the plaintiff, and (4) resulted in injury to the plaintiff.'" *Kiesau v. Bantz*, 686 N.W.2d 164, 175 (Iowa 2004) (quoting *Johnson v. Nickerson*, 542 N.W.2d 506, 510 (Iowa 1996)). Statements that have "a natural tendency to provoke the plaintiff to wrath or expose him to public hatred, contempt, or ridicule, or to deprive him of the benefit of public confidence or social intercourse" are defamatory as a matter of law and can give rise to a claim for libel per se. *Johnson*, 542 N.W.2d at 510 (citation omitted) (internal quotations marks omitted); 1 Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* 2-112 to -113 (4th ed. 2012) (stating that the communications giving rise to libel per se "should be referred to as 'defamatory as a matter of law'"). "In statements that are libelous per se, falsity, malice, and injury are presumed and proof of these elements is not necessary." *Kiesau*, 686 N.W.2d at 175. Thus, in order to maintain an action for libel per se, Doe has the burden of proving that Hagar (1) published a statement that was (2) defamatory as a matter of law and (3) was of and concerning Doe. *See Bierman v. Weier*, 826 N.W.2d 436, 464 (Iowa 2013).

We address each element in turn.[1]

---

[1] We note that Doe does not challenge the district court's conclusion that she failed to establish a claim of libel per quod. Therefore, we limit our analysis of Doe's

### i. Publication

"Publication is an essential element of defamation and simply means a communication of statements to one or more third persons." *Huegerich v. IPB, Inc.*, 547 N.W.2d 216, 221 (Iowa 1996). To satisfy the publication element, Doe produced evidence that various individuals read Hagar's statements and understood them as referring to her. In opposition, Hagar contends that this evidence does not establish a "publication" because Doe directed the individuals to the statements, thereby violating Iowa's prohibition against self-publication.

Under Iowa law, "[t]he injured party cannot create [her] own cause of action by communicating the [defamatory] statements to others unless under strong compulsion to do so."[2] *Belcher v. Little*, 315 N.W.2d 734, 738 (Iowa 1982). Hagar is correct that many of the individuals identified by Doe became aware of the challenged statements through conversations with Doe. Nevertheless, on this record, a jury could conclude that the statements were published to at least one individual. *See* Restatement (Second) of Torts § 577 cmt. b (1977) (explaining that to satisfy the publication element, "[i]t is enough that [the statement] is communicated to a single individual other than the one defamed"). For example, although Doe told Lynette Daniels that Doe was referenced in the book and Daniels testified that she read the book "when [she] knew it hit the shelves," the record is not clear as to the order in which these events occurred. If a jury found that Daniels read the statements on her own accord prior to Doe's confirmation that Hagar mentioned her in *Red*, then the statements were "published" to Daniels. In addition, with respect to certain individuals, Doe did not directly communicate the statements, but merely provided

---

defamation action to libel per se. *See United States v. Simmons*, 964 F.2d 763, 777-78 (8th Cir. 1992) (explaining that an issue not raised on appeal is waived).

[2]Doe does not argue that she was under a strong compulsion to communicate the challenged statements.

the information necessary for the individuals to locate Hagar's statements and read them if they so chose. It is for the jury to determine whether Doe's actions amount to self-publication. *See* Restatement (Second) of Torts § 617 cmt. a (1977) ("The question of whether the defendant has published the defamatory communication to a third person . . . [is] ordinarily for the jury or trier of fact to determine."). Accordingly, we conclude on the record before us that the trier of fact must determine whether Doe has satisfied the publication element of her libel per se claim.

### ii.   Defamatory as a Matter of Law

Next, Doe has the burden of proving that Hagar's statements are defamatory as a matter of law. *See Bierman*, 826 N.W.2d at 464. "If a statement is clear and unambiguous, the issue of whether the statement is [defamatory as a matter of law] is for the court." *Kiesau*, 686 N.W.2d at 175. Here, the district court acknowledged, and the parties do not dispute, that calling a person an extortionist is defamatory as a matter of law. *See Rees v. O'Malley*, 461 N.W.2d 833, 835 (Iowa 1990) (accusing someone of extortion is defamatory as a matter of law because "[e]xtortion is a criminal charge that both involves moral turpitude and subjects the party charged to a prison sentence"). In addition, Hagar's statements in *Red* imply that Doe may have lied about being pregnant and giving birth to her son. Under Iowa law, "an accusation that a person is a liar" is defamatory as a matter of law. *Schlegel*, 585 N.W.2d at 222. Indeed, Hagar's statements regarding Doe's criminality, dishonesty, and sexual exploits have "a natural tendency to provoke [Doe] to wrath or expose [her] to public hatred, contempt, or ridicule" within the community of individuals that recognize her as the subject of the statements. *Johnson*, 542 N.W.2d at 510. Therefore, we conclude that Hagar's statements are defamatory as a matter of law.

-8-

### iii. Of and Concerning the Plaintiff

Finally, the challenged statements must be understood as being "of and concerning the plaintiff." *Bierman*, 826 N.W.2d at 464 (citation omitted) (internal quotation marks omitted). Ordinarily, this is a question of fact for the jury to determine. *See* Restatement (Second) of Torts § 617 cmt. a (1977).

Under Iowa law, the "of and concerning the plaintiff" element "only requires that a third-party recipient [of a statement] be able to understand who is the intended subject." *Bierman*, 826 N.W.2d at 464. "[I]t is not necessary to constitute a libel that the article name the person libeled, but it must by inference or innuendo at least refer in an intelligent way to the person libeled." *Boardman & Cartwright v. Gazette Co.*, 281 N.W. 118, 120 (Iowa 1938).

> Although defamatory words must refer to an ascertainable person, the plaintiff need not be named if the alleged libel contains matters of description or other references therein, or the extraneous facts and circumstances . . . show that plaintiff was intended to be the object of the alleged libel, and was so understood by others.

*Ball v. Taylor*, 416 F.3d 915, 917 (8th Cir. 2005) (alteration in original) (citation omitted) (internal quotations marks omitted).

Hagar advances the district court's rationale that Doe cannot maintain an action for libel per se under Iowa law because extrinsic knowledge is necessary for a reader to understand that the challenged statements concern Doe. We disagree. Iowa law provides, "[i]n an action for slander or libel, it shall not be necessary to state any extrinsic facts for the purpose of showing the application to the plaintiff of any defamatory matter out of which the cause of action arose. . . ." Iowa Code § 659.1 (2009). In analyzing a claim of libel per se, the Iowa Supreme Court has stated that "[t]he necessary implication of this statutory language is that a libel action can be

pursued *even when 'extrinsic facts' are required*" to ascertain the subject of the defamatory statements. *Bierman*, 826 N.W.2d at 465 (emphasis added); *accord* 1 Robert D. Sack, *Sack on Defamation: Libel, Slander, and Related Problems* 2-143 (4th ed. 2012) ("If it can be shown either that the implication of the [statement] was that the plaintiff was the person meant or that he or she was understood to be the person spoken about *in light of the existence of extrinsic facts not stated in the article*, then [the statement] is 'of and concerning' the plaintiff as though the plaintiff was specifically named." (emphasis added)). Simply put, the need for extrinsic knowledge to identify Doe as the subject of the challenged statements does not render Doe's libel per se claim fatal under Iowa law.

Although Hagar does not name Doe in *Red*, he concedes that those who already knew the "story" of Hagar and Doe could recognize Doe as the subject of his statements. In addition, Doe has presented evidence that when certain individuals read the statements in question, they knew Doe to be the subject. Because the challenged statements "contain[] matters of description" and "other references" that show that Doe was the subject, and because Doe has presented evidence that others understood her to be the subject, *see Ball*, 416 F.3d at 917, we conclude that Doe has shown the existence of a fact issue that precludes summary judgment on the question of whether the challenged statements were "of and concerning" her.

### iv. Hagar's Defenses

In defense of Doe's claim, Hagar contends that the challenged statements are substantially true and, alternatively, non-actionable opinion. Iowa recognizes "substantial truth as a defense in a defamation action." *Behr v. Meredith Corp.*, 414 N.W.2d 339, 342 (Iowa 1987). "[L]ibel defendants are not required to establish the literal truth of every detail of the publication, as long as the 'sting' or 'gist' of the defamatory charge is substantially true." *Campbell v. Quad City Times*, 547 N.W.2d 608, 610 (Iowa Ct. App. 1996). The gist or sting of a defamatory charge is "'the heart of the matter in question—the hurtfulness of the utterance.'" *Behr*, 414 N.W.2d at

-10-

342 (quoting *Vachet v. Cent. Newspapers, Inc.*, 816 F.2d 313, 316 (7th Cir. 1987)). The court determines the gist or sting by "'look[ing] at the highlight of the [publication], the pertinent angle of it.'" *Id.* (quoting *Vachet*, 816 F.2d at 316).

Here, we agree with Doe that the gist or sting of Hagar's statements is that (1) Doe, a relative stranger to Hagar, approached him to engage in sexual intercourse and (2) that Doe subsequently lied about the identity of the father of her child in order to extort him. When considering the evidence in the light most favorable to Doe, we conclude that the evidence is sufficient to submit the question of substantial truth to the jury. *See id.* (noting that when the underlying facts as to the gist or sting of the defamatory charge are in dispute, the question of substantial truth is one for the jury).

We also reject Hagar's contention that his statements are non-actionable opinion. The connotation that Doe lied about her pregnancy or the identity of the father in order to extort Hagar "'is sufficiently factual to be susceptible of being proven true or false.'" *Yates v. Iowa W. Racing Ass'n*, 721 N.W.2d 762, 773 (Iowa 2006) (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 21-22 (1990)). Indeed, "an accusation of a crime is laden with factual content." *Id.*

### v. Summary

Because a reasonable jury could return a verdict for either party on Doe's claim of libel per se, we conclude that there is a genuine dispute that precludes summary judgment on that claim. *See Amini*, 643 F.3d at 1074. Therefore, we reverse the district court's grant of summary judgment in favor of Hagar on Doe's claim of libel per se.

-11-

**B. False Light Invasion of Privacy**

Next, Doe argues that the district court erred in granting summary judgment in favor of Hagar on her claim of false light invasion of privacy.

"A claim for false light invasion of privacy is based upon an untruthful publication which places a person before the public in a manner that would be highly offensive to a reasonable person." *Willson v. City of Des Moines*, 386 N.W.2d 76, 83 n.8 (1986). In addition, the actor must have "had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Winegard v. Larsen*, 260 N.W.2d 816, 823 (Iowa 1977) (quoting Restatement (Second) of Torts § 652E)).

The district court granted summary judgment on the sole ground raised by Hagar in his motion: that Doe did not satisfy the "publicity" element of a false light claim. Iowa courts have adopted the Restatement's articulation of the "publicity" element:

> "Publicity," [for an invasion of privacy claim] means that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge. The difference is not one of the means of communication, which may be oral, written or by any other means. It is one of a communication that reaches, or is sure to reach, the public.
>
> Thus it is not an invasion of the right of privacy . . . to communicate a fact concerning the plaintiff's private life to a single person or even to a small group of persons. On the other hand, any publication in a newspaper or a magazine, even of small circulation, or in a handbill distributed to a large number of persons, or any broadcast over the radio, or statement made in an address to a large audience, is sufficient to give publicity within the meaning of the term . . . . The

-12-

distinction, in other words, is one between private and public communication.

*Bierman*, 826 N.W.2d at 466 (alteration in original) (quoting Restatement (Second) of Torts § 652D cmt. a. (1977)). The district court reasoned that even though Hagar's disclosures regarding Doe were widely circulated to the public at large, they cannot be regarded as substantially certain to become public knowledge given that only a small group of individuals will know that the statements concern Doe. On that basis, the district court concluded that Doe cannot satisfy the "publicity" element of her false light claim.

After reviewing the record, we agree with Doe that questions of fact exist as to whether the challenged statements were sufficiently publicized. In her complaint, Doe alleges that Hagar's statements placed her in a false light "within the community of people who knew about [her] relationship with Mr. Hagar and the birth and death of [her child]." Indeed, the widespread distribution of *Red* demonstrates that Hagar's statements are widely available within the community of individuals that could recognize Doe as the subject of the statements, including Hagar's associates, band members, and touring staff; those that Doe knew in New York City while she was seeing Hagar; and Doe's friends and acquaintances in Lansing, Michigan. The trier of fact will need to determine whether Hagar's statements have been sufficiently publicized to support a false light claim. *Cf. Bierman*, 826 N.W.2d at 466 (concluding that fact issues remained as to whether the false light allegations were sufficiently publicized based on record evidence that twenty to thirty copies of the book were distributed, the author participated in a television interview promoting the book, the book was available for purchase online for two months, and "several people" read portions of the book).

Accordingly, we reverse the district court's grant of summary judgment in favor of Hagar on Doe's claim of false light invasion of privacy.

-13-

## C. Intentional Infliction of Emotional Distress

Doe also argues that the district court erred in granting summary judgment in favor of Hagar on her claim of intentional infliction of emotional distress (IIED). Under Iowa law, the elements of the tort of IIED are:

(1)    Outrageous conduct by the defendant;
(2)    The defendant's intentional causing, or reckless disregard of the probability of causing emotional distress;
(3)    Plaintiff suffering severe or extreme emotional distress; and
(4)    Actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

*Vinson v. Linn-Mar Comm. Sch. Dist.*, 360 N.W.2d 108, 118 (Iowa 1984) (quoting *Powell v. Khodari-Intergreen Co.*, 334 N.W.2d 127, 129 (Iowa 1983)). The district court granted summary judgment on Doe's IIED claim on two grounds: (1) Hagar's conduct was not sufficiently "outrageous" and (2) Doe did not present substantial evidence that she suffered severe emotional distress. With respect to evidence of emotional distress, the district court emphasized that the evidence Doe put forth consists exclusively of her own conclusory statements. In reviewing the record, we agree with the district court's ruling and therefore affirm the grant of summary judgment on Doe's IIED claim.

## D. Breach of Contract

Doe argues that the district court erred in granting summary judgment in favor of Hagar on her breach-of-contract claim. At issue is the confidentiality provision of the Agreement, which states that "[t]his Agreement and the terms thereof are deemed by the parties to be confidential and [the parties] further agree that they shall not cause or permit this Agreement to be disclosed to any other party . . . ." Doe argues

that Hagar breached this provision by disclosing in *Red* that he provided financial assistance to Doe. As noted, New York law governs Doe's breach-of-contract claim pursuant to the choice-of-law provision in the Agreement.

Under New York law, "[t]he elements of a cause of action to recover damages for breach of contract are the existence of a contract, the plaintiff's performance under the contract, the defendant's breach of the contract, and resulting damages." *Kausal v. Educ. Prods. Info. Exch. Inst.*, 105 A.D.3d 909, 910 (N.Y. App. Div. 2013). "Construction of an unambiguous contract is a matter of law, and the intention of the parties may be gathered from the four corners of the instrument and should be enforced according to its terms." *Beal Sav. Bank v. Sommer*, 865 N.E.2d 1210, 1213 (N.Y. 2007). If, however, the agreement in question contains an ambiguity, extrinsic evidence may be considered to resolve competing interpretations. *Brad H. v. City of New York*, 951 N.E.2d 743, 746 (N.Y. 2011). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990).

We conclude, and the parties do not appear to dispute, that the confidentiality provision of the Agreement unambiguously prohibits either party from disclosing the existence of the Agreement or its terms. However, the parties take opposing positions as to whether Hagar's reference in *Red* to providing Doe financial assistance constitutes the disclosure of a term of the Agreement—namely, Hagar's obligation to pay Doe certain sums of money. In granting summary judgment on Doe's claim, the district court found "that the statements in *Red* contain nothing more than a vague reference to Hagar's relationship with Doe." We disagree. By acknowledging that he gave financial assistance to Doe, a jury could find that Hagar disclosed a term of the Agreement even though he does not describe his financial assistance as a legal obligation. Because a jury could conclude that Hagar breached the Agreement through his statements, we conclude that the jury must decide the ultimate issue of breach. *See F. Garofalo Elec. Co. v. New York Univ.*, 300 A.D.2d 186, 189 (N.Y.

-15-

App. Div. 2002) ("The question of whether there has been substantial performance—or a breach—is to be determined, whenever there is any doubt, by the trier of fact."). Therefore, we reverse the district court's grant of summary judgment on Doe's breach-of-contract claim.

### E. Breach of the Covenant of Good Faith and Fair Dealing

Finally, Doe claims that the district court erred in granting summary judgment in favor of Hagar on her claim for breach of the covenant of good faith and fair dealing. Doe argues that Hagar breached the covenant because his statements deprived Doe of the benefit of the Agreement.

"Within every contract is an implied covenant of good faith and fair dealing." *Aventine Inv. Mgmt., Inc. v. Canadian Imperial Bank of Commerce*, 265 A.D.2d 513, 513-14 (N.Y. App. Div. 1999). "This covenant is breached when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other party of the right to receive the benefits under their agreement." *Id.* at 514. As discussed, Doe's benefit under the Agreement was the financial assistance Hagar promised to provide. Because Hagar's statements did not deprive Doe of this benefit, the district court did not err in granting summary judgment as to this claim.

## III. Conclusion

We affirm the district court's grant of summary judgment in favor of Hagar on Doe's claims of IIED and breach of the covenant of good faith and fair dealing. We reverse the grant of summary judgment on Doe's claims of libel per se, false light invasion of privacy, and breach of contract, and remand to the district court for further proceedings consistent with this opinion.

_____

-16-