MAHASKA BOTTLING CO., Plaintiff,

v.

**PEPSICO INC. and Bottling Group LLC, Defendant.**

**No. 4:16–cv–00114–JEG**

United States District Court, S.D. Iowa, Central Division.

Signed 9/15/2017

James Robert Krause, Pro Hac Vice, Lawrence J. Friedman, Pro Hac Vice, Shauna A. Izadi, Pro Hac Vice, Jason H. Friedman, Pro Hac Vice, Mazin A. Sbaiti, Pro Hac Vice, Friedman & Feiger, LLP, Dallas, TX, Johannes (John) H. Moorlach, Whitfield & Eddy PLC, Des Moines, IA, for Plaintiff.

Debra Hulett, Ryan Gene Koopmans, Spencer S. Cady, Nyemaster Goode PC, Des Moines, IA, Linda H. Martin, Freshfields Bruckhaus Deringer US LLP, New York, NY, Thomas Ensign, Pro Hac Vice, Freshfields Bruckhaus Deringer US LLP, Washington, DC, for Defendant.

## ORDER

JAMES E. GRITZNER, Senior Judge

This matter comes before the court on a Motion to Dismiss (the Motion) pursuant to Federal Rule of Civil Procedure 12(b)(6) (the Motion), ECF No. 28, filed by Defendants PepsiCo, Inc. (PepsiCo) and Bottling Group, LLC d/b/a Pepsi Beverage Company (PBC) (collectively, Defendants or Pepsi). Defendants request an order dismissing Counts III, IV, and VI through X of the First Amended Complaint (the Amended Complaint), ECF No. 25, filed by Plaintiff Mahaska Bottling Company, Inc. (Mahaska). Mahaska resists. The Court held a hearing on the Motion on July 18, 2017. Attorneys Shauna A. Izadi, Jason H. Friedman, and John H. Moorlach were present for Mahaska, and attorneys Thom-

as Ensign, Linda H. Martin, and Debra Hulett were present for Defendants. The matter is fully submitted and ready for disposition.

## I. BACKGROUND[1]

The Amended Complaint presents ten counts against Defendants. Defendants move to dismiss Counts III, IV, and VI through X, all of which are asserted against both Defendants.[2] Count III alleges violations of the Robinson–Patman Act, 15 U.S.C. §§ 13–14, against both Defendants. Count IV alleges violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2. Count VI alleges breach of fiduciary duty. Counts VII and VIII allege predatory pricing and attempt to monopolize in violation of the Iowa Competition Law, Iowa Code §§ 553.4–5, based on the same conduct at issue in the federal antitrust claims. Count IX alleges business defamation or disparagement based on PepsiCo communications with certain customers. Count X alleges a violation of the Lanham Act, 15 U.S.C. § 1123(a), based on PBC's use of Pepsi trademarks.

### A. Carbonated Soft Drink Bottling

Mahaska is an independent bottler of carbonated beverages and has been in business since 1889. Branded carbonated soft drinks (CSD) are produced using concentrate flavor ingredients (concentrate). Bottlers such as Mahaska purchase concentrate inputs from concentrate suppliers such as PepsiCo and manufacture CSD products pursuant to licenses with the concentrate suppliers. The finished CSD products are marketed under the brands of the concentrate suppliers, *i.e.*, Pepsi–Cola. Bottlers are often responsible not only for producing from concentrate the finished CSD products under the concentrate supplier's brand, which is the process known as "bottling," but also for distributing, marketing, pricing, and selling finished CSD products to customers. In this context, the bottlers' customers are generally retailers who sell finished CSD products to end-consumers. By definition, independent bottlers do not formulate or sell their own brands of concentrate but instead purchase this product input from branded concentrate suppliers such as PepsiCo. Sometimes independent bottlers engage in bottling or distributing the brands of multiple concentrate suppliers. For example, Mahaska bottles and distributes Pepsi-brand CSD products, such as Pepsi and Mountain Dew, and also distributes brands offered by Dr Pepper Snapple Group (DPSG), another concentrate supplier. Bottlers, including Mahaska, also sell other products and services, such as snacks, sports beverages, and vending services.

PepsiCo is a concentrate supplier, which means that it formulates the key input (concentrate syrup) for CSD beverages for its brands such as Pepsi and Mountain Dew, and it owns the intellectual property relating to those brands.[3] Concentrate sup-

---

**1.** On consideration of the Motion, this Court assumes the facts alleged in the Amended Complaint to be true. See United States ex rel. Raynor v. Nat'l Rural Utils. Co-op. Fin., Corp., 690 F.3d 951, 955 (8th Cir. 2012). The Court also draws upon the documents attached to the Amended Complaint for background information. See Miller v. Redwood Toxicology Lab., Inc., 688 F.3d 928, 931 (8th Cir. 2012).

**2.** Defendants do not move to dismiss the following three counts: Count I, which alleges breach of contract against PepsiCo based on violation of exclusive territorial rights; Count II, which alleges breach of contract against PepsiCo based on unauthorized increases in concentrate price; and Count V, which alleges tortious interference with contracts and prospective economic advantage against both Defendants.

**3.** PepsiCo is engaged in other businesses as well. For example, it owns the Frito–Lay brand and sells snack foods, and it owns the

pliers such as PepsiCo sell concentrate to bottlers. Concentrate suppliers may also engage in marketing activities for their soft drink brands, such as national advertising campaigns. Concentrate suppliers sometimes negotiate directly with large, nationwide retailers about those retailers' wholesale purchases of finished CSD products, albeit subject to constraints that may exist in concentrate supplier-bottler relationships, as discussed below.

Concentrate suppliers may also perform some or all of the functions of a bottler in-house. In 2010, PepsiCo acquired two independent bottlers and distributors who were consolidated into PBC. At that time, PBC was responsible for about 56% of bottler-distributed sales for PepsiCo's CSD brands. Mahaska alleges that Pepsi-Co uses and has historically used a network of independent bottlers, each having exclusive geographic territories, to deliver finished CSD products to consumers. Exclusive territorial rights for bottlers or distributors appears to be the norm for concentrate suppliers, such that retailers who purchase any given brand of CSD in any given territory will be served by only one wholesale seller, whether that seller is an independent bottler or a bottling arm of the parent concentrate supplier. Exclusive distributorship agreements between concentrate companies and independent bottlers often include restrictions on those independent bottlers' ability to bottle for competing concentrate companies.

## B. Mahaska's Historical Relationship with PepsiCo

Mahaska initially entered into an exclusive distributorship arrangement with PepsiCo in 1928 as part of a broad PepsiCo initiative to expand its brand penetration using independent bottlers. In 1948, Mahaska and PepsiCo entered into an Exclusive Bottling Appointment (EBA) that, as amended, still governs the parties' relationship. The EBA grants Mahaska the exclusive right to bottle and distribute certain specified Pepsi-brand products in perpetuity within the southeast Iowa territory defined in the EBA.[4] The EBA specifies that Pepsi will provide to Mahaska the necessary key ingredients for bottling Pepsi-Cola, and Mahaska will adhere to Pepsi's quality standards and will make vigorous efforts to sell Pepsi-brand products. Under the EBA, Mahaska must bear its own expenses in bottling, selling, and distributing Pepsi products but is also allowed to set its own prices with retailer customers.

PepsiCo has acknowledged the important role that independent bottlers have played in its business. In 1975, PepsiCo's president testified before the Federal Trade Commission (FTC) that the promise of perpetual exclusivity was critical to getting independent bottlers to sign up with Pepsi. Am. Compl. ¶ 26 (citing Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc., 431 F.3d 1241, 1249 (10th Cir. 2005)), ECF No. 25.[5] In 1980, PepsiCo's vice pres-

---

Quaker Oats brand and sells breakfast cereals.

4. As defined in the documents attached to the Amended Complaint, Mahaska's exclusive territory consists of the southeast Iowa counties of Marion, Mahaska, Keokuk, Washington, Jefferson, Wapello, Monroe, Lucas, and Appanoose, as well as portions of Jasper and Powesheik Counties. The EBA has been amended over time to include additional geographical territories in Nebraska and Kansas and also

to include additional PepsiCo products, though the territory amendments were not attached to the Amended Complaint.

5. The Amended Complaint quotes extensively from the factual recitations in Pepsi-Cola Bottling Co. of Pittsburg. The Court may consider these materials of public record as factual background on a motion to dismiss. See Wieland v. U.S. Dep't of Health & Human Servs., 793 F.3d 949, 953 (8th Cir. 2015).

ident for corporate affairs testified before Congress about the need to protect Pepsi-Co's exclusive appointments. Pepsi–Cola Bottling Co. of Pittsburg, 431 F.3d at 1250. As highlighted in the Amended Complaint, this PepsiCo executive testified:

> If Exclusive Territories are eliminated, dozens and dozens of our Pepsi–Cola bottlers will be driven out of business by their larger neighbors. This will be accomplished quickly through the ability of larger bottlers by virtue of their location in major areas and their bottling capacity to take the cream of the business ... leaving smaller bottlers with less profitable accounts to service.... Long term, not only will there be fewer outlets handling soft drinks, but after the bottler ranks are decimated, the survivors, I am certain, will be able to raise soft drink prices higher than ever....
>
> We totally support our bottlers in their efforts to preserve the Exclusive Territories we granted them because we are deeply grateful for their past and continuing commitment to their parent company and because we need such fiercely competitive partners in our future.

Id. at 1250; see also Am. Compl. ¶ 27.

Nevertheless, beginning in the early 1990s Pepsi perceived headwinds pushing against its distribution partnerships that led it to seek constraints on the independence of its independent bottlers. As the Tenth Circuit Court of Appeals outlined:

> First, significant consolidation occurred on the retail side of the soft drink industry as a result of the growth of large, nationwide retail chains like Wal–Mart and Sam's Club. PepsiCo's biggest customers had stores in multiple bottling territories and began demanding that PepsiCo service their needs at a national rather than a local level. Second, in the

1980's, PepsiCo's chief rival, [Coke,] established a single anchor bottler ... and began acquiring its individual bottlers. This consolidation enabled Coke to benefit from the economy of scale and to negotiate more effectively with the large retail chains.

Pepsi–Cola Bottling Co. of Pittsburg, 431 F.3d at 1250. As a result, PepsiCo developed Customer Development Agreements (CDAs) with large national retailers in the early 1990s. These CDAs purported to set uniform national wholesale prices for finished CSD products for these customers. These agreements were not binding on local independent bottlers such as Mahaska, who retained full discretion to set prices in their territories pursuant to their EBAs. Additionally, PepsiCo offered Marketplace Investment Agreements (MIAs) to bottlers, whereby PepsiCo would make payments to bottlers who accepted a portion of rebates given to national retailers in exchange for retailer promotional efforts on behalf of Pepsi brands. Bottlers such as Mahaska had the right to decline to participate in either of these arrangements; Mahaska appears to have declined to participate.[6] In addition, PepsiCo encouraged consolidation of independent bottlers into "anchor bottlers" who worked closely with PepsiCo, id. at 1251, and eventually directly acquired bottlers, including, notably, PBC.

In September 1993, PepsiCo Vice President and Associate General Counsel Gerald W. Casey issued a memorandum (the Casey Memorandum) to PepsiCo bottlers regarding the PepsiCo-bottler relationship. Mahaska attached this memorandum to its Amended Complaint. The Casey Memorandum states that PepsiCo bottlers have always enjoyed exclusive rights in their

---

**6.** Mahaska's precise allegation is that it "does not agree to blindly participate in any CIA or MIA arrangements." Am. Compl. ¶ 35.

respective territories, and "[e]qually fundamental is the Bottler's independence in determining price and other conditions of sale to its customers." Casey Memorandum at 2, Am. Compl. Ex. C, ECF No. 25–3. With PepsiCo making "headquarters calls" to key national customers on behalf of bottlers, the memorandum sets forth bottlers' rights in connection with any commitments that PepsiCo headquarters might make to retailers who purchase Pepsi-brand CSD products from bottlers. Though PepsiCo might encourage independent bottlers to participate in national programs, PepsiCo pledged that it would not do so "by means of retribution, pressure or coercion," and "the Bottler's independence in determining its prices and other terms of sale will not be compromised." Casey Memorandum at 2. The principles announced in this memorandum have been called the "Rule of '94."

While the Rule of '94 was declared with respect to PepsiCo's bottler network broadly, PepsiCo also entered into a similar agreement specifically with Mahaska in 2003. This agreement, referred to as the "Omnibus Side Letter," covered a number of topics, but Mahaska highlights Paragraph 8 for purposes of this suit. Paragraph 8 of the Omnibus Side Letter states that Mahaska will not be required to enter into any MIAs or participate in any CDAs, and Mahaska shall assume no obligations under any agreements made by PepsiCo or other bottlers. Pursuant to this agreement, where PepsiCo has implemented national pricing programs for certain customers and those prices fall below Mahaska's wholesale prices, and where Mahaska has nevertheless agreed to deliver those Pepsi-Co-negotiated prices to customers, Pepsi-Co pledged to make payments to Mahaska to account for the difference. Mahaska alleges that PepsiCo has stopped making these payments.

## C. DPSG's Relationships with Mahaska and PBC

Both Mahaska and PBC have ongoing business relationships with DPSG that are potentially relevant to some of Mahaska's claims. DPSG is a concentrate supplier, and its brands compete with PepsiCo's brands. Mahaska has an agreement with DPSG whereby Mahaska is the exclusive distributor (but apparently not the bottler) of DPSG products in certain territories. Mahaska has distributed DPSG products since 1975. Mahaska alleges that it has exclusive rights to distribute DPSG products in the "Mahaska Territories," which Mahaska defines as the designated areas where it has the exclusive right to bottle Pepsi products.

Meanwhile, PBC distributes and also bottles DPSG products in certain territories pursuant to a relationship that predated PBC's acquisition by PepsiCo. Mahaska alleges that "[d]espite Mahaska's territorial exclusivity with PepsiCo, PBC is a direct competitor of Mahaska in the Mahaska Territories on certain products such as [DPSG] products," in addition to other products and services such as snacks and vending services. Am. Compl. ¶ 97. Even though PepsiCo and DPSG offer competing brands of carbonated soft drinks, PBC has continued bottling and distributing DPSG products on an exclusive or nonexclusive basis, depending on the territory, following PBC's acquisition by PepsiCo. When PepsiCo proposed acquiring PBC, the FTC investigated the transaction and expressed concerns about PBC's ties to DPSG. Specifically, the FTC claimed that once PepsiCo acquired PBC, there would not (absent FTC intervention) be adequate safeguards against PepsiCo accessing, through PBC, competitively sensitive and confidential information of DPSG. The FTC believed that this access to competitively sensitive, confidential information

could harm competition by eliminating direct competition between PepsiCo and DPSG, by allowing PepsiCo (through PBC) to control DPSG's prices, and by facilitating unlawful collusion between PepsiCo and DPSG. The FTC entered into a consent order (the Consent Order) with PepsiCo under which PepsiCo agreed to certain restrictions on PepsiCo's use of DPSG information, including the installation of internal company firewalls. PepsiCo agreed to file compliance reports relating to the Consent Order for twenty years following the transaction.

### D. Defendants' Conduct

The alleged conduct by Defendants that forms the basis for the claims at issue in this Motion falls into three general categories: (1) PepsiCo's and PBC's pricing practices; (2) PepsiCo's communications with large customers; and (3) PBC's use of Pepsi trademarks.

*PepsiCo's pricing practices.* Mahaska alleges that PepsiCo has executed a "price squeeze." The two levers in this price squeeze are the price of concentrate that PepsiCo sells to Mahaska as an input for CSD and the price of finished CSD products that PepsiCo negotiates with national customers, the latter of which is not contractually binding on Mahaska. Mahaska alleges that PepsiCo has implemented steady price increases on concentrate, 3% or more annually or 40% overall in the past decade. Mahaska alleges that "presumably" PBC faced the same concentrate price increases. Am. Compl. ¶ 52. Mahaska alleges that these increases in concentrate prices have not corresponded to PepsiCo's costs. Meanwhile, PepsiCo has decreased effective wholesale prices for finished CSD products as negotiated in agreements with national customers. Mahaska also alleges that PepsiCo has persistently attempted to have independent bottlers share in the costs of price-reducing programs such as rebates to large retailer customers, and

that PepsiCo has refused to pay to Mahaska the rebate payments that would account for the difference between PepsiCo's negotiated discounts and Mahaska's wholesale prices pursuant to the Omnibus Side Letter.

*PepsiCo's communications with "dollar channel" customers.* According to Mahaska, PepsiCo has entered into agreements with Family Dollar and Dollar General (which Mahaska refers to as, together, the "Dollar Channel") regarding pricing for Pepsi-brand finished CSD products. Mahaska alleges that these agreements provided for lower wholesale prices for these Dollar Channel customers than what is typically offered to other retailers. Mahaska alleges that it cannot meet the prices promised in the agreements because it does not price discriminate among customers. Mahaska was not privy to these negotiations, and the agreements are not binding on Mahaska.

Citing two documents attached as exhibits to the Amended Complaint, Mahaska alleges that PepsiCo disparaged Mahaska in communications with Dollar Channel customers. It cites two documents in support. The first document, Exhibit D, Mahaska labels as a "Family Dollar email communication." Am. Compl. ¶ 63. However, this document appears to be a posting on Family Dollar's internal web portal, dated February 26, 2016. This communication, on its face, does not appear to be sent to or from either PepsiCo or any affiliated entity. It reads, in relevant part:

> Please be advised that your store is 1 or 67 that will no longer have Pepsi service. Your local Pepsi bottler is unwilling to do business with Family Dollar due to our aggressive pricing. We have exhausted all options through 6 months of negotiations to fix this situation. Select stores may have service halt-

ed immediately while others may receive service until the end of March, 2016.

Next week, we will communicate an action plan that will have Pepsi space switched to Coke, Dr Pepper / Snapple, and Shasta or Faygo.

Am. Compl. Ex. D, ECF No. 25–4. Mahaska is not mentioned on the face of this document, and Mahaska does not allege to whom this message was communicated. But the Amended Complaint implies that this document concerns Mahaska and that its recipients were Family Dollar stores within Mahaska's territory. Mahaska alleges that, in fact, it was not unwilling to do business with Family Dollar, and neither Family Dollar nor PepsiCo ever negotiated with Mahaska.

The second document, Exhibit G, is an email exchange that encompasses a message from an individual at PBC and an individual at Family Dollar. In the email, dated March 25, 2016, a merchandise coordinator at Family Dollar asks Donna Daniels of PBC, "For the 34 stores not going forward with pepsi, which of these have DrPepper delivered by Pepsi?" Am. Compl. Ex. G at 2, ECF No. 25–7. Daniels forwarded that message the next day to a number of recipients who appear to be representatives of various independent bottlers, adding: "Hi please let me know if you deliver Dr Pepper in your market. Also, please confirm if you are still making deliveries to FD. If you are ¡still not aligned to the FD program, deliveries should be stopped on 3/31." Am. Compl. Ex. G at 1. Mahaska alleges that this email constitutes notification that PepsiCo and PBC have entered into an agreement with Family Dollar covering not only Pepsi-brand products but DPSG products as well. Mahaska clarified at oral argument that it interprets this document as evidence that Defendants pulled DPSG products from Family Dollar stores.

*PBC's use of Pepsi trademarks.* As noted above, Mahaska's EBA gives it the exclusive right to bottle and distribute PepsiCo products in the designated territories. This includes the right to bottle and distribute Pepsi products bearing Pepsi trademarks in the territory. The EBA documents attached to the Amended Complaint also specify that PepsiCo is the ultimate owner of the relevant mark(s). Mahaska alleges, further, that it has spent decades and millions of dollars building goodwill associated with the Pepsi trademarks within its territories. Mahaska alleges that it is "inseparable" from the Pepsi trademarks within its territories. Am. Compl. ¶ 235.

Mahaska alleges that PBC has engaged in commerce within Mahaska's EBA–prescribed territories and done so using Pepsi marks: placing Pepsi-branded equipment for customers, driving trucks bearing Pepsi marks, and wearing uniforms bearing Pepsi marks. The Amended Complaint does not specify what PBC is doing in Mahaska's territories—whether it is selling Pepsi carbonated soft drinks, selling DPSG products, or engaging in another line of business entirely. Nevertheless, Mahaska alleges that PBC has caused customer confusion. Mahaska's evidence for this is that PepsiCo has forwarded complaints from customers upset with PBC for PBC's conduct within Mahaska's EBA territories to Mahaska.

## II. DISCUSSION

### A. Standard for a Motion to Dismiss

To survive a motion to dismiss pursuant to Federal Rule of Procedure 12(b)(6) for failure to state a claim, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." United States ex rel. Raynor v. Nat'l Rural Utils. Co-op. Fin., Corp., 690 F.3d 951, 955 (8th Cir. 2012)

(internal quotation marks omitted) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)); see also L.L. Nelson Enters., Inc. v. Cty. of St. Louis, Mo., 673 F.3d 799, 804 (8th Cir. 2012). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Benton v. Merrill Lynch & Co., Inc., 524 F.3d 866, 870 (8th Cir. 2008) (internal quotation marks omitted) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Raynor, 690 F.3d at 955 (quoting Iqbal, 556 U.S. at 678, 129 S.Ct. 1937). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678, 129 S.Ct. 1937.

Mahaska also attaches documents to its opposition brief that it argues the Court should consider on a motion to dismiss. Exhibit A consists of a bundle of internal PepsiCo documents, including emails and a strategic planning document about PepsiCo's relationships with independent bottlers. Opp. Br. Ex. A, ECF No. 33–2. Exhibit B is a chart that compares the differential over time between PepsiCo's concentrate prices and Coke's. Opp. Br. Ex. B., ECF No. 33–3. Mahaska argues that the Court may consider Exhibit A because its Amended Complaint refers to a "plan" on the part of PepsiCo, Am. Compl. ¶ 145, incorporating by reference PepsiCo planning documents into the Amended Complaint.

While the Court may generally consider documents attached to pleadings, Miller v. Redwood Toxicology Lab., Inc., 688 F.3d 928, 931 (8th Cir. 2012), Mahaska did not attach these documents to either its original Complaint or its Amended Complaint. "The court generally must ignore materials outside the pleadings," id., and the documents in Exhibit A are outside the pleadings. See BJC Health Sys. v. Columbia Cas. Co., 348 F.3d 685, 687 (8th Cir. 2003) ("Most courts ... view 'matters outside the pleading' as including any written or oral evidence in support of or in opposition to the pleading that provides some substantiation for and does not merely reiterate what is said in the pleadings." (alteration in original) (quoting Gibb v. Scott, 958 F.2d 814, 816 (8th Cir. 1992))). That the Amended Complaint refers to a "plan" does not mean that the Amended Complaint incorporates by reference the document attached to its opposition to the Motion to Dismiss marked as Exhibit A. The Amended Complaint does not refer to these particular documents nor turn on their existence or content. This effort is not like a party submitting the operative document on a motion to dismiss in a breach of contract action. See, e.g., Silver v. H & R Block, Inc., 105 F.3d 394, 397 (8th Cir. 1997). Mahaska may not substantiate its allegations with new documentary evidence in briefing on a motion to dismiss.[7]

---

7. In addition, neither document attached to Mahaska's brief contains anything that would alter the Court's analysis. Exhibit B merely restates in graphical form the allegations in Paragraph 50 of the Amended Complaint. Exhibit A, meanwhile, provides substantiation for Mahaska's allegations about PepsiCo's intent to exercise greater control over its independent bottlers, but the analysis below does not depend on allegations about PepsiCo's intent.

## B. Antitrust Claims

As outlined above, Mahaska makes antitrust claims under § 2 of the Sherman Act, the Robinson–Patman Act, and the Iowa Competition Law. The Court will address Mahaska's claims in that order.

### 1. Sherman Act § 2: Attempted Monopolization

 Section 2 of the Sherman Act makes it unlawful for a firm to "monopolize" or, under certain circumstances, to attempt to do so. Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP, 540 U.S. 398, 407, 124 S.Ct. 872, 157 L.Ed.2d 823 (2004) (quoting 15 U.S.C. § 2). "The offense of monopolization has two elements: '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'" United States v. Microsoft Corp., 253 F.3d 34, 50 (D.C. Cir. 2001) (en banc) (per curiam) (quoting United States v. Grinnell Corp., 384 U.S. 563, 571, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966)). This second element is often referred to as anticompetitive conduct or exclusionary conduct. See id. at 58. Mahaska's § 2 claim, however, is a claim for attempted monopolization, and the elements for an attempted monopolization claim are slightly different than those of a standard § 2 claim. The elements of an attempted monopolization claim are exclusionary conduct, a specific intent to monopolize,[8] and a dangerous probability of achieving monopoly power. Spectrum Sports, Inc. v. McQuillan, 506 U.S. 447, 456, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). In addition, a private plaintiff seeking relief for viola-

tions of the antitrust laws pursuant to the Clayton Act, as Mahaska does here, must establish antitrust injury, which is an injury "that (1) is 'of the type the antitrust laws were intended to prevent' and (2) 'flows from that which makes defendants' acts unlawful.'" Atl. Richfield Co. v. USA Petrol. Co., 495 U.S. 328, 349, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) (quoting Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)).[9]

#### a. Exclusionary Conduct

 The offense of monopolization is more than the mere possession of monopoly power. A firm possessing monopoly power must also engage in exclusionary, or anticompetitive, conduct to violate § 2. Trinko, 540 U.S at 409, 124 S.Ct. 872; Microsoft, 253 F.3d at 58. In general, anticompetitive conduct is conduct that has no legitimate business purpose, or conduct that only makes sense for a firm because it eliminates or excludes competition. HDC Med., Inc. v. Minntech Corp., 474 F.3d 543, 549 (8th Cir. 2007). Conduct is anticompetitive when it harms the competitive process, and thereby consumers—not merely when it harms an individual competitor. Microsoft, 253 F.3d at 58. To avoid sanctioning fierce competition on the merits, courts examine whether conduct is exclusionary by looking at its effects. Conduct undertaken specifically to damage a competitor is not de facto anticompetitive; a § 2 plaintiff must allege that the conduct had or will have an actual anticompetitive effect. Id. at 59; see also Olympia Equip. Leasing Co. v. W. Union Tel. Co., 797 F.2d 370, 379 (7th Cir. 1986) ("[I]f conduct is not objectively anticompetitive the fact

---

8. Defendants do not appear to dispute that Mahaska has adequately alleged this element.

9. Suits for injunctive relief under § 16 of the Clayton Act possess the same antitrust injury

requirement, but a plaintiff need not show actual injury; a "threatened injury" will suffice. Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 111, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986).

that it was motivated by hostility to competitors ('these turkeys') is irrelevant.").

"[M]eans of illicit exclusion, like the means of legitimate competition, are myriad." Microsoft, 253 F.3d at 58. Accordingly, the Amended Complaint potentially alleges a few different forms of exclusionary conduct on the part of Defendants.

### i. Price Squeeze

■ Central to the Amended Complaint are Mahaska's allegations of a "price squeeze" coordinated by PepsiCo and implemented in part through PBC. Mahaska alleges that PepsiCo, which is a concentrate supplier and not a bottler or distributor, has negotiated nationwide wholesale prices for Pepsi-brand CSD products with large retailers—even though those retailers actually purchase the finished CSD products from bottlers, not from PepsiCo. The prices set in these agreements between PepsiCo and retailers are generally lower than prices set by independent bottlers such as Mahaska. Moreover, Mahaska alleges that to the extent Pepsi promised to pay rebates to independent bottlers such as Mahaska where PepsiCo's negotiated prices fell below the bottler's prices for those products, Pepsi has either failed to do so or has attempted to coerce bottlers into accepting PepsiCo's prices. Meanwhile, PepsiCo has increased the price of concentrate it sells to bottlers. Mahaska alleges increased concentrate costs have caused Mahaska to increase the wholesale price of the finished CSD products it sells to retailers. Mahaska alleges that Pepsi's scheme is meant to force independent bottlers out of the bottling business so that PepsiCo—through PBC—can take over the bottling business and raise prices in the future.

These allegations fit the definition of a classic "price squeeze." In a price squeeze, a vertically integrated firm with market power in an upstream (input) market "squeezes" its competitors' profit margins by (1) raising the price of the essential input (2) while also lowering prices in the downstream (end-product) market in which the vertically integrated firm competes with the "squeezed" firm. Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc., 555 U.S. 438, 449, 129 S.Ct. 1109, 172 L.Ed.2d 836 (2009). However, the antitrust laws do not prohibit price squeezes as such. Id. at 452, 456, 129 S.Ct. 1109. The antitrust laws see a price squeeze as two distinct actions: the charging of high upstream prices and of low downstream prices. Id. Each of these actions may yet be unlawful under § 2 in certain circumstances, and doctrines concerning the legality of high upstream prices (or refusals to deal) and of low (or predatory) downstream pricing already exist apart from one another.

■ The Sherman Act generally does not prohibit the charging of high input prices, even from a firm with market power: "[I]f a firm has no antitrust duty to deal with its competitors at wholesale, it certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous." Id. at 450, 129 S.Ct. 1109. The refusal to deal doctrine, discussed below, covers the circumstances in which a dominant firm may have a duty to deal with its rivals under certain terms. Trinko, 540 U.S. at 408, 124 S.Ct. 872. Similarly, "[c]utting prices in order to increase business often is the very essence of competition." Linkline, 555 U.S. at 451, 129 S.Ct. 1109 (alteration in original) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 594, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). Courts are extremely concerned with the risk of "chilling aggressive price competition." Id. The "predatory pricing" doctrine, further discussed below, covers the situations in which a firm may harm competition by charging prices that are too low. Brooke Grp. Ltd.v. Brown & Williamson Tobacco

Corp., 509 U.S. 209, 222–24, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993).

### ii. Refusal to Deal

■ Although Mahaska does not state a valid claim for relief based on a price squeeze theory, this Court must analyze whether PepsiCo's concentrate pricing alleged in the Amended Complaint operates as a method of exclusion; in particular, whether PepsiCo's price increases constitute a constructive refusal to deal with Mahaska. "Under certain circumstances, a refusal to cooperate with rivals can constitute anticompetitive conduct and violate § 2." Trinko, 540 U.S. at 408, 124 S.Ct. 872. Nevertheless, the U.S. Supreme Court has placed a "high value" on a firm's right to refuse to deal with other firms, and to determine its prices, quantity, and other terms of dealing—even when that firm possesses monopoly power. See id. at 407–08, 124 S.Ct. 872 (quoting Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 601, 105 S.Ct. 2847, 86 L.Ed.2d 467 (1985)). The Supreme Court has observed that refusal to deal with a rival may be anticompetitive when it is preceded by a voluntary, profitable course of dealing with the rival, the termination of which causes a loss of short-term profits suggesting that the firm expects to recoup those profits later in the absence of competition. Trinko, 540 U.S. at 409, 124 S.Ct. 872. Here, the Amended Complaint details at great length the extent of Pepsi's voluntary, profitable course of dealing with Mahaska. PepsiCo actually has an explicit contractual duty to supply Mahaska under certain terms. But Mahaska does not allege that PepsiCo refuses to sell it concentrate at all, even at retail price, as was the case in Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. at 593–94, 105

S.Ct. 2847. Rather, Mahaska alleges that increases in concentrate price have eroded (or threatens to erode) Mahaska's ability to compete, constituting a constructive refusal to deal.

It is true that a firm may, by raising prices, impose terms on a competitor-customer that effectively amount to a refusal to provide that customer an input needed to compete effectively. See Safeway Inc. v. Abbott Labs., Nos. C 07-05470 CW, 2010 WL 147988, at *7 (N.D. Cal. Jan. 12, 2010) ("By setting such unattractive terms, Abbott essentially refused to deal with its competitors."); cf. Linkline, 555 U.S. at 450, 129 S.Ct. 1109 ("[F]or antitrust purposes, there is no reason to distinguish between price and nonprice components of a transaction."). Under Mahaska's theory, PepsiCo is attempting to handicap Mahaska by charging it high input prices—even though ultimately Mahaska is selling Pepsi-brand products. Once Mahaska is out of business, PBC could move in and take over the Pepsi-bottling business in Mahaska's exclusive territories. Then, Mahaska alleges, with competition from Mahaska in the bottling market eliminated, PepsiCo would "raise prices dramatically." [10] Am. Compl. ¶ 167.

But this theory of PepsiCo's price increases as a refusal to deal lacks the characteristic features of an anticompetitive refusal to deal. Specifically, Mahaska does not allege that Pepsi is foregoing (or threatening to forego) a profitable supply relationship to stymie competition. Instead, Mahaska alleges that PepsiCo is aggrandizing its near-term profits in the concentrate market at the expense of Mahaska's profits in the bottling market. Am. Compl. ¶ 57(a) ("PepsiCo's increases ... were not reflective of increased costs to PepsiCo, but were merely a way for Pepsi-

---

10. Since Mahaska alleges that PepsiCo has already increased concentrate prices, this looming price increase presumably refers to

the prices charged by bottlers to retailers for finished CSD products.

Co to grab a larger share of the profit stream from its bottlers like Mahaska."); id. ¶ 162 ("By increasing the cost of concentrate, PepsiCo shifts profit margin from Mahaska and other bottlers to itself as the concentrate manufacturer and seller, by artificially inflating the price of concentrate."). This is, at worst, an allegation that a (concentrate) monopolist is charging monopoly prices. See Trinko, 540 U.S. at 407, 124 S.Ct. 872 (charging monopoly prices is not unlawful). Mahaska alleges that it is also breach of contract.[11] The antitrust laws, however, do not impose a duty on PepsiCo, even if it is a monopolist, to set its prices in a way that preserves Mahaska's margins. See Aerotec Int'l, Inc. v. Honeywell Int'l, Inc., 836 F.3d 1171, 1184 (9th Cir. 2016) ("[T]here is 'no duty to deal under the terms and conditions preferred by [a competitor's] rivals'; there is only a duty not to refrain from dealing where the only conceivable rationale ... is 'to sacrifice short-term benefits in order to obtain higher profits in the long run from the exclusion of competition.'" (second alteration in original) (quoting Linkline, 555 U.S. at 457, 129 S.Ct. 1109, and MetroNet Servs. Corp. v. Qwest Corp., 383 F.3d 1124, 1132 (9th Cir. 2004))).

### iii. Predatory Pricing

■ Mahaska also alleges that PepsiCo has set prices with national retailers in such a way as to drive independent bottlers such as Mahaska out of business. Generously construed, Mahaska's Amended Complaint alleges that PepsiCo has lowered the effective price of finished CSD products such that the price falls below PBC's cost to deliver those products. In other words, Mahaska alleges that Pepsi operates PBC at a loss in order to drive competing independent bottlers out of business.[12]

■ Predatory pricing is the practice of "pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 118, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986). However, predatory pricing only violates the antitrust laws in very specific circumstances, because "cutting prices in order to increase business often is the very essence of competition." Brooke Grp., 509 U.S. at 226, 113 S.Ct. 2578 (quoting Cargill, 479 U.S. at 122 n.17, 107 S.Ct. 484). A prima facie predatory pricing claim requires allegations that a rival's pricing was below an appropriate measure of cost and that the rival had a "reasonable prospect" (for claims made under the Robinson–Patman Act) or a "dangerous probability" (for claims made under the Sherman Act) of recouping its losses from pricing below cost and profiting from its investment based on supracompetitive prices charged following the eventual exit of competitors who are unable to promptly re-enter the market. Bathke v. Casey's Gen. Stores, Inc., 64 F.3d 340, 344 (8th Cir. 1995) (citing Brooke Grp., 509 U.S. at 222–24, 113 S.Ct. 2578).[13] Whether the predatory pric-

---

**11.** PepsiCo's contractual duties should be distinguished with any duties imposed by the antitrust laws, however. Those duties may or may not overlap. See In re Adderall XR Antitrust Litig., 754 F.3d 128, 135 (2d Cir. 2014) ("The mere existence of a contractual duty to supply goods does not by itself give rise to an antitrust 'duty to deal.'").

**12.** Technically, Mahaska alleges that PepsiCo *either* operates PBC at a loss or sells concentrate to PBC at a price significantly lower than the concentrate is sold to Mahaska, which Mahaska alleges violates the Robinson–Patman Act's prohibition on price discrimination. This alternative theory is discussed later.

**13.** Mahaska appears to argue both that harm to competition can be found without establishing dangerous probability of recoupment and that a defendant accused of predatory pricing can harm competition in a plaintiff's market even if the defendant does not sell into that market, in both instances relying on Utah

ing claim is pled as a violation of the Robinson–Patman Act or the Sherman Act, these elements are essential to establish "real market injury," which is required under both statutes. Brooke Grp., 509 U.S. at 226, 113 S.Ct. 2578.

Mahaska implies that PBC, to the extent it honors PepsiCo's pricing agreements with national retailers such as Dollar General and Family Dollar, delivers finished CSD products below cost—again, assuming that PBC receives concentrate from PepsiCo at the same prices that Mahaska pays. Defendants argue that Mahaska has no basis for alleging that PBC ever sold finished CSD products below cost, but Mahaska has adequately pled this element. The Amended Complaint states that Mahaska cannot meet the prices for finished CSD products promised by PepsiCo (and fulfilled by PBC). Mahaska is engaged in the same business as PBC; the Court can infer at the pleading stage that PBC and Mahaska have similar cost structures. See 3A Areeda & Hovenkamp, Antitrust Law ¶ 723e (4th ed. 2015) ("[A]lthough they do not have direct information about the defendant's costs ... [competitors] usually know those costs better than anyone else.").

With respect to the second element, recoupment, Mahaska alleges that if PepsiCo is able to eliminate Mahaska from the marketplace, it could raise prices of finished CSD products dramatically in the future. Factors relevant to whether a sufficient probability of recoupment exists include "the extent and duration of the alleged predation, the relative financial strength of the predator and its intended victim, and their respective incentives and

will." Brooke Grp., 509 U.S. at 225, 113 S.Ct. 2578. A plaintiff's predatory pricing theory must also accord with the structure of the relevant market or markets; the market sought to be monopolized must be susceptible to sustained supracompetitive prices following the success of a predatory pricing scheme, such as one characterized by high barriers of entry. Id. at 225–26, 113 S.Ct. 2578.

Mahaska has alleged that PepsiCo has sought to implement uniform national prices on finished CSD products for decades. It has not alleged the duration that prices sought by PepsiCo and implemented by PBC have been below PBC's costs, or even below Mahaska's costs. Ultimately, Mahaska does not plausibly allege a sufficient probability of recoupment. There is little indication that if Mahaska were driven out of its territories and replaced with PBC, prices of any relevant product would increase. Retailers in Mahaska's territories do not currently have any choice in bottlers if they wish to carry Pepsi-brand products, and Mahaska possesses its exclusive territorial rights "in perpetuity." Am. Compl. ¶ 17. Mahaska also does not have the right to sell Pepsi products to retailers in any territories outside those set forth in the EBA. Because of this, other Pepsi bottlers in other areas cannot operate as a constraint on Mahaska's pricing. The EBA prevents PepsiCo from unilaterally replacing Mahaska as a bottler in Mahaska's territories if PepsiCo is unsatisfied with PepsiCo's pricing. Nor does the Amended Complaint contain any indication that Mahaska operates as a constraint on Pepsi bottlers in other territories—at least one of whom, PBC, Mahaska alleges already

Pie Co. v. Continental Baking Co., 386 U.S. 685, 87 S.Ct. 1326, 18 L.Ed.2d 406 (1967). In Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. at 221–22, 113 S.Ct. 2578, however, the Supreme Court implicitly overruled Utah Pie, labeling it an "early judi-

cial inquiry." See also Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petrol. Corp., 79 F.3d 182, 191 (1st Cir. 1996) (recognizing Utah Pie's implicit overruling in Brooke Group); Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1445 n.16 (9th Cir. 1995) (same).

prices below cost and below Mahaska's prices. The Amended Complaint alleges no facts that would provide a basis to conclude that PBC, if it took over bottling of Pepsi-branded products in the Mahaska Territories, would be able to charge supra-competitive prices. Replacing Mahaska with PBC would simply result in the same number of Pepsi bottlers (one) serving the same customers in that area. That Pepsi bottler would still compete against the same set of firms who offer other finished CSD products in that area currently, about whom the Amended Complaint has little to say. Absent the ability to charge supra-competitive prices later, Defendants would have no ability to recoup their losses if they are currently pricing below cost in order to drive Mahaska—who has a *perpetual* bottling right granted by PepsiCo—out of business. See Brooke Grp., 509 U.S. at 224, 113 S.Ct. 2578 ("For the investment to be rational, the [predator] must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered." (alteration in original) (quoting Matsushita, 475 U.S. at 588–89, 106 S.Ct. 1348)).

#### iv. Joint Monopoly

 Mahaska also alleges a "joint monopoly" in violation of § 2 between Defendants and DPSG. Mahaska alleges that PepsiCo and DPSG have a common distribution relationship through PBC, which also competes with Mahaska for business distributing DPSG products. Mahaska alleges that PepsiCo and DPSG have come together through PBC to "fix[ ] prices below cost in an effort to drive competitors, including Mahaska, out of the market." Am. Compl. ¶ 179. Mahaska nevertheless

contends that proof of any agreement between Defendants and DPSG is not necessary to establish what it calls "joint monopolization" under § 2.

As an initial matter, § 2 does not support "shared" or "joint" monopoly claims. See, e.g., Midwest Gas Servs., Inc. v. Ind. Gas Co., 317 F.3d 703, 713 (7th Cir. 2003) ("[A] § 2 claim can only accuse one firm of being a monopolist."); City of Moundridge, Kan. v. Exxon Mobil Corp., 471 F.Supp.2d 20, 42 (D.D.C. 2007) ("This shared monopoly argument is insufficient to state a claim that defendants have monopolized or attempted to monopolize the natural gas market in violation of Section 2 of the Sherman Act when Section 2 liability requires actual or attempted monopolization by one defendant."); Santana Prods., Inc. v. Sylvester & Assocs., Ltd., 121 F.Supp.2d 729, 737 (E.D.N.Y. 1999) ("Most district courts that have addressed the viability of a shared monopoly theory under Section 2 have rejected it as contrary to the plain language and legislative intent of the Sherman Act."); 3B Areeda & Hovenkamp, Antitrust Law ¶ 810g (4th ed. 2015) ("[C]ourts and the Federal Trade Commission have universally rejected claims that § 2 condemns "shared" monopoly."); cf. Morgenstern v. Wilson, 29 F.3d 1291, 1295 n.2 (8th Cir. 1994) (noting a split of authority on the viability of "joint monopolization" claims but determining it was unnecessary to resolve the question in that case).[14] The very notion of a "joint monopoly" is a contradiction in terms. By definition only a single firm may possess a monopoly under § 2. See Rebel Oil Co. v. Atl. Richfield Co., 51 F.3d 1421, 1443 (9th Cir. 1995) ("To pose a threat of monopolization,

---

**14.** Mahaska cites United States v. American Airlines, Inc., 743 F.2d 1114, 1116–17 (5th Cir. 1984), and argues that a plaintiff does not need to allege an agreement to monopolize to state a claim for attempted joint monopolization. American Airlines stands for the proposi-

tion that an express invitation to fix prices by one competitor to another can suffice to establish attempt liability even if no agreement was reached. Id. at 1118. The Amended Complaint makes no such allegation.

one firm *alone* must have the power to control market output and exclude competition."). Section 1, by contrast, and under which Mahaska makes no claim, covers concerted anticompetitive activity by firms with or without market power. See, e.g., JTC Petrol. Co. v. Piasa Motor Fuels, Inc., 190 F.3d 775, 780 (7th Cir. 1999) (comparing bases for liability under § 1 and § 2 in considering a "joint monopolization" claim); In re Delta/AirTran Baggage Fee Antitrust Litig., 733 F.Supp.2d 1348, 1366–67 (N.D. Ga. 2010) (collecting cases).

The closest recognized basis for § 2 liability to Mahaska's "joint monopolization" theory is that of conspiracy to monopolize. See Baxley–DeLamar Monuments, Inc. v. Am. Cemetery Ass'n, 843 F.2d 1154, 1157 (8th Cir. 1988) (stating the elements of conspiracy to monopolize under § 2). But Mahaska states in its brief that "antitrust conspiracy ... is not an element of *any* claim." Mahaska Opp. Br. 2, ECF No. 33–1. Meanwhile, the Amended Complaint alleges a "conspiracy to monopolize" among PepsiCo, PBC, and DPSG, whereby Defendants and DPSG would fix the price of finished CSD products at a low price in an effort to exclude independent bottlers such as Mahaska. E.g., Am. Compl. ¶¶ 90–91, 174, 179–80. Even if, as it appears, Mahaska has backed off this theory of § 2 liability, the Court shall briefly analyze the Amended Complaint's factual allegations to determine whether the Amended Complaint pleads exclusionary conduct based on conspiracy. See Baxley–DeLamar, 843 F.2d at 1157 (looking not to the plaintiff's legal labels but to facts pled in § 2 claim to determine its sufficiency).

 Conspiracy to monopolize has three elements: "conspiracy, specific intent to monopolize, and overt acts in furtherance of the conspiracy." Id. The first element—an antitrust conspiracy—requires "a conscious commitment to a common scheme designed to achieve an unlaw-

ful objective." Monsanto Co. v. Spray–Rite Serv. Corp., 465 U.S. 752, 764, 768, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). The Amended Complaint essentially alleges a predatory pricing conspiracy among Defendants and DPSG: the unlawful objective, in this view, is to drive out independent bottlers such as Mahaska. This type of conspiracy is actionable under the Sherman Act, but it is evaluated similarly to a unilateral predatory pricing claim. See Matsushita, 475 U.S. at 588–90, 106 S.Ct. 1348. But it is even more difficult for a predatory pricing conspiracy to succeed in excluding competition and eventually reaping supracompetitive prices than it is for a single firm to do so. Id. In this context, the Amended Complaint, notwithstanding its general factual allegations of conspiracy, ultimately contains insufficient factual material to allow the inference that either Defendant conspired with DPSG to set prices in an effort to exclude competition. See Twombly, 550 U.S. at 557, 127 S.Ct. 1955 (conspiracy allegations "must be placed in a context that raises a suggestion of a preceding agreement").

The Amended Complaint alleges that DPSG has its products distributed by Mahaska and by PBC, among others. It further alleges that the FTC entered into a Consent Order with PepsiCo upon its acquisition of PBC ensuring separation between PBC's DPSG–distribution activities and PepsiCo's concentrate business, which competes with DPSG's concentrate business. Then the Amended Complaint cites an email chain between Family Dollar, PBC, and a number of Pepsi bottlers, attached as Exhibit G. Mahaska takes this document to mean that Defendants and DPSG have come to an agreement on prices to exclude independent bottlers, and that PBC enforces such an agreement, all in violation of the Consent Order. The document cannot support this interpretation. Instead, it simply confirms two facts

previously alleged: that Family Dollar was going to forego Pepsi-branded products from certain bottlers, and that some Pepsi bottlers also distribute DPSG products. Mahaska argues that the command from PBC to bottlers that "[i]f you are still not aligned to the FD program, deliveries should be stopped on 3/31," Am. Compl. ¶ 92, refers to deliveries of DPSG products. However, nowhere in the Amended Complaint is there any indication that PBC (let alone PepsiCo) has the authority to compel independent bottlers such as Mahaska to cease from distributing DPSG products to retailers who refuse to carry Pepsi products, nor that PBC has ever been successful in doing so. To the contrary, Mahaska alleges that its EBA with PepsiCo does not govern Mahaska's relationship with DPSG. This email, then, does not provide "enough factual matter . . . to suggest that an agreement was made." See Twombly, 550 U.S. at 556, 127 S.Ct. 1955.[15]

### b. Dangerous Probability of Achieving Monopoly Power

▮ Defendants also argue that Mahaska has failed to allege a dangerous probability of achieving monopoly power regardless of the theory of exclusionary conduct. Attempted monopolization claims require a plaintiff to show that defendant's exclusionary conduct coincided with "a dangerous probability of achieving monopoly power" in a relevant market. Spectrum Sports, 506 U.S. at 456, 113 S.Ct. 884. Monopoly power is "the power to control prices or exclude competition." Microsoft, 253 F.3d at 51 (quoting United States v. E.I. du Pont de Nemours & Co., 351 U.S. 377, 391, 76 S.Ct. 994, 100 L.Ed. 1264 (1956)). "[A] firm is a monopolist if it can profitably raise prices substantially above the competitive level." Id. A plaintiff often establishes monopoly power based on circumstantial evidence of market structure; this approach requires a plaintiff to "establish that the defendant has a dominant market share in a well-defined relevant market." HDC Med., 474 F.3d at 547; see also Microsoft, 253 F.3d at 51 ("[M]onopoly power may be inferred from a firm's possession of a dominant share of a relevant market that is protected by entry barriers."). This is the standard method of demonstrating a dangerous probability of achieving monopoly power in attempted monopolization cases. See Spectrum Sports, 506 U.S. at 455, 113 S.Ct. 884; HDC Med., 474 F.3d at 550.[16]

▮ The "dangerous probability" standard for an attempt to monopolize claim requires less than a showing of actual monopoly power under a standard § 2

**15.** Mahaska's predatory-pricing-conspiracy allegations are made even more implausible by the fact that the Amended Complaint contains no allegations whatsoever about DPSG's behavior. The Amended Complaint contains no allegations regarding whether DPSG engages in campaigns with national retailers regarding the prices for finished CSD products in a manner similar to PepsiCo's CDAs. Nor does the Amended Complaint allege any facts regarding efforts by DPSG to set or influence pricing for Dr. Pepper-branded finished CSD products distributed by independent bottlers such as Mahaska, even though Mahaska actually distributes DPSG products. In Twombly, it was not enough that the complaint in question alleged mere parallel conduct among purported co-conspirators—the

Amended Complaint here lacks even that. See Twombly, 550 U.S. at 553, 127 S.Ct. 1955 ("While a showing of parallel 'business behavior is admissible circumstantial evidence from which the fact finder may infer agreement,' it falls short of 'conclusively establish[ing] agreement or . . . itself constitut[ing] a Sherman Act offense.' " (alterations in original) (quoting Theatre Enterp., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540–41, 74 S.Ct. 257, 98 L.Ed. 273 (1954))).

**16.** A plaintiff may also establish monopoly power based on direct evidence of control of prices or exclusion of competitors. PepsiCo, Inc. v. Coca–Cola Co., 315 F.3d 101, 107 (2d Cir. 2002) (per curiam).

claim. Gen. Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 807 (8th Cir. 1987). A plaintiff must still allege that the defendant has sufficient share of a properly defined product market. Microsoft, 253 F.3d at 81. A relevant market is defined by reference to cross-elasticity of demand, or to "the reasonable interchangeability ... between the product itself and possible substitutes for it." HDC Med., 474 F.3d at 547. "[T]he product market can be determined by analyzing how 'consumers will shift from one product to the other in response to changes in their relative costs.'" Id. (quoting SuperTurf, Inc. v. Monsanto Co., 660 F.2d 1275, 1278 (8th Cir. 1981)). Relevant factors for ascertaining the boundaries between product markets include price, perception of products as separate economic entities, products' characteristics and uses, methods of production, customer identities, customer sensitivity to price changes, and delivery or distribution methods. Id. at 547–48. In addition, for an attempt to monopolize claim, it is important for the plaintiff to allege that the relevant market is one capable of monopolization; factors such as the existence of high entry barriers, high concentration, and consumer preferences are relevant. See Broadcom Corp. v. Qualcomm, Inc., 501 F.3d 297, 318 (3d Cir. 2007).

Questions of market definition are rather fact-intensive and generally inappropriate for resolution on a motion to dismiss. E.g., Todd v. Exxon Corp., 275 F.3d 191, 199–200 (2d Cir. 2001); Microsoft, 253 F.3d at 81; Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 436 (3d Cir. 1997); see also HDC Med., 474 F.3d at 547 ("The relevant product market is a question of fact."). The types of pleadings that fail to allege a plausible relevant product market generally fail because the pleading either attempts to limit the relevant market with respect to "a single brand, franchise, institution, or comparable entity that competes with potential substitutes" or because the pleading does not even attempt to explain its allegations. Todd, 275 F.3d at 200. For example, had the Amended Complaint attempted to allege a market for bottling, distribution, or sale of *Pepsi* products only, its alleged market likely would have been inadequate. See, e.g., Queen City Pizza, 124 F.3d at 435, 438 (affirming dismissal of claims based on product market defined as ingredients and supplies used in the operation of Domino's franchise stores).

Here, however, Mahaska alleges that the relevant market is "all Carbonated Soft Drinks." Am. Compl. ¶ 95. Mahaska alleges that this market contains both finished CSD products and the concentrate used to produce CSD. In doing so, Mahaska has failed to provide even a cursory explanation for why bottled carbonated soft drinks compete with concentrate syrup. The Amended Complaint in fact alleges that concentrate is an input into finished CSD products. Concentrate and finished CSD products have different customers: concentrate companies sell concentrate to bottlers, while bottlers (and concentrate companies who perform bottling in house) sell finished CSD products primarily to retailers. Concentrate is not a functional substitute for a finished CSD product from the perspective of a retailer: the latter may be sold directly to end-consumers while the former still requires all the services of a bottler before the retailer may sell it to end-consumers. And the Amended Complaint understandably does not allege that an end consumer of carbonated soft drinks has any use for concentrate syrup. The Amended Complaint makes no effort to explain its market definition beyond the bare allegation, and Mahaska was not able to provide one in its briefs or at oral argument. See Todd, 275 F.3d at 200; cf. Compl. ¶ 29, In the Matter of PepsiCo, Inc., Dkt No. C–4301, 2010 WL 9549982 (F.T.C. Sept. 27, 2010), Am. Compl. Ex. E,

ECF No. 25–5 (FTC allegation that concentrate and finished CSD products are two separate product markets). Even upon limited review of this normally fact-intensive question on a motion to dismiss, Mahaska's attempted market definition proves infirm.

Defendants also challenge Mahaska's market share allegations as insufficient to support a § 2 claim. The standard for alleging market share for an attempted monopolization claim in the face of a motion to dismiss is fairly low: some courts have allowed plaintiffs' claims to proceed based on allegations of market shares below 50%, particularly if there are factors present showing that the market in question is susceptible to monopolization (such as high barriers to entry). See Domed Stadium Hotel, Inc. v. Holiday Inns, Inc., 732 F.2d 480, 490–91 (5th Cir. 1984); accord M & M Med. Supplies & Serv., Inc. v. Pleasant Valley Hosp., Inc., 981 F.2d 160, 168 (4th Cir. 1992) (en banc) ("[C]laims involving between 30% and 50% shares should usually be rejected, except when conduct is very likely to achieve monopoly or when conduct is invidious."). There also may be a safe harbor for defendants with alleged market shares of less than 30%. E.g., Rebel Oil Co., Inc v. Atl. Richfield Co., 51 F.3d 1421, 1438 (9th Cir. 1995); M & M Med. Supplies, 981 F.2d at 168; ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc., 249 F.Supp.2d 622, 648 (E.D. Pa. 2003) ("As a matter of law, a market share of less than 30 percent is presumptively insufficient to establish the market power that is a prerequisite to a defendant's enjoying a dangerous probability of achieving monopoly power.").

Yet Mahaska does not actually allege either Defendant's market share at any point. All the Amended Complaint contains is an allegation that PepsiCo and DPSG combined have a market share of over 50%, and over 80% together in some undefined territories, including territories served by Mahaska.[17] DPSG, of course, is not a defendant in this case, and the Amended Complaint alleges that PepsiCo and DPSG are "direct competitors." Am. Compl. ¶ 77. These aggregated market share figures do not suffice to establish that *PepsiCo* possesses a dangerous probability of monopolizing any market.

These bare allegations of market share are also insufficient because they are unconnected to Mahaska's alleged product and geographic markets. It is unclear if these combined share figures include all sales of both concentrate and finished CSD products, as would be necessary under Mahaska's alleged product market of "all Carbonated Soft Drinks." If this were the case, it would be mathematically impossible for PepsiCo and DPSG combined to approach 80% market share in a combined market for both finished CSD and concentrate in the territories served by Mahaska, because in those territories it is *Mahaska*, not PepsiCo or DPSG, who sells finished CSD products under the Pepsi brand. Thus, in Mahaska's territories, PepsiCo could not even possess over 50% share of *Pepsi-brand products only* in a product market that includes both concentrate and finished CSD products—Mahaska itself would possess the other half due to its exclusive CSD sales rights. It may not be necessary for a plaintiff to affix a precise number to a defendant's market share to

---

17. The Amended Complaint has nothing to say about PBC's market share other than that PBC sells Pepsi products in 80% of the United States, which is not actually a market share allegation, and that the companies that were merged into PBC together accounted for about 75% of Pepsi-brand sales in 2009. As discussed above, the Amended Complaint does not allege a market of Pepsi-brand products only, and such an allegation would likely be insufficient as a matter of law.

allege a dangerous probability of monopolization at the pleading stage if the pleading otherwise provides grounds to infer a sufficient share in the relevant market. See Broadcom, 501 F.3d at 319 (holding that the district court erred in finding that the complaint failed to meet the dangerous-probability standard as a matter of law even where the complaint did not allege the defendant's market share). The Amended Complaint, however, neither alleges Defendants' market share directly nor supports any inference that their share is sufficiently high to pose a dangerous probability of monopoly in any relevant market.

#### c. Antitrust Injury

Antitrust injury is an essential part of any claim made under § 4 (damages) or § 16 (injunctive relief) of the Clayton Act. Fair Isaac Corp. v. Experian Info. Sols., Inc., 650 F.3d 1139, 1144, 1146 (8th Cir. 2011). "An antitrust injury is 'injury of the type that the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'" Id. (quoting Brunswick Corp., 429 U.S. at 489, 97 S.Ct. 690). In other words, a plaintiff who has suffered or will suffer an injury in fact from a defendant's conduct must also show that the defendant's conduct will harm competition and that the plaintiff's injury results from the aspect of the defendant's conduct that harms competition. Atl. Richfield Co., 495 U.S. at 344, 110 S.Ct. 1884 ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior."). Antitrust injury presents a fundamental problem for Mahaska's § 2 claim, however styled.

Mahaska's § 2 theories depend on the same alleged harm to competition. That is, Mahaska asserts that the conduct alleged in the Amended Complaint, such as Pepsi-Co's pricing practices, has caused and will cause Mahaska to lose customers. Mahaska alleges that PepsiCo is trying to control the sale of finished CSD products to retail customers typically performed by independent bottlers. Mahaska alleges that Pepsi-Co is engaging in activity that breaches PepsiCo's agreements with Mahaska (such as agreeing on national prices with chain retailers such as Family Dollar) and is attempting to squeeze Mahaska out of the business entirely so PBC could take over bottling duties in Mahaska's current territories. Defendants argue that Mahaska has failed to allege any injury at all, but losing customers and the threat of losing a substantial part of its business are real injuries. The question is whether these injures and threatened injuries flow from that which would make Defendants' actions anticompetitive.

Antitrust laws are meant to protect competition, not competitors. E.g., Atl. Richfield, 495 U.S. at 338, 110 S.Ct. 1884. Viable competitors are of course a necessary precondition to the existence of competition, but the antitrust laws are generally unconcerned with the identity of the firms in the competitive mix over time. A substantial body of case law addressing the plight of the terminated distributor is relevant here. The antitrust laws are aimed primarily at maintaining interbrand competition within a relevant market. Volvo Trucks N. Am., Inc. v. Reeder–Simco GMC, Inc., 546 U.S. 164, 180, 126 S.Ct. 860, 163 L.Ed.2d 663 (2006). As the Supreme Court has put it:

> Interbrand competition is the competition among the manufacturers of the same generic product—television sets in this case—and is the primary concern of antitrust law. The extreme example of a deficiency of interbrand competition is monopoly, where there is only one manufacturer. In contrast, intrabrand competition is the competition between the

distributors—wholesale or retail—of the product of a particular manufacturer. Cont'l T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 52 n.19, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977). In this case, interbrand competition could mean either competition between Pepsi, Coca–Cola, and other beverage brands for sales of carbonated beverages, or competition for shelf space between specific bottlers (i.e., Mahaska and a bottler offering Coca–Cola in Mahaska's territory) offering various finished CSD products to retailers in specific locations. Simply replacing one exclusive distributor with another generally does not affect interbrand competition. See, e.g., Elecs. Commcn's Corp. v. Toshiba Am. Consumer Prods., Inc., 129 F.3d 240, 245 (2d Cir. 1997) ("[T]he allegations in ECC's complaint establish nothing more than a run-of-the-mill exclusive distributorship controversy, where a former exclusive distributor is attempting to protect its competitive position vis a vis its supplier. Such exclusive distributorship arrangements are presumptively legal."); Crane & Shovel Sales Corp. v. Bucyrus–Erie Co., 854 F.2d 802, 806 (6th Cir. 1988) ("We have consistently held that a complaint which simply alleges that a manufacturer substituted one distributor for another fails to state a violation of the rule of reason, unless it also alleges anticompetitive effect at the interbrand level."); Burdett Sound, Inc. v. Altec Corp., 515 F.2d 1245, 1249 (5th Cir. 1975) ("Lest any other former distributors succumb to the temptation of treble damages, we reiterate that it is simply not an antitrust violation for a manufacturer to contract with a new distributor, and as a consequence, to terminate his relationship with a former distributor, even if the effect of the new contract is to seriously damage the former distributor's business."); accord NYNEX Corp. v. Discon, Inc., 525 U.S. 128, 137, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998) ("The freedom to switch suppliers lies close to

the heart of the competitive process that the antitrust laws seek to encourage.").

Mahaska alleges that with it out of the way, PepsiCo and PBC could charge retail customers higher prices for finished CSD products, but Mahaska has offered no explanation for why this would be. The replacement of Mahaska by PBC in Mahaska's territories would result in retailers having no fewer CSD options from which to purchase, and Mahaska does not allege that it currently sets its prices based on competition from Pepsi-affiliated bottlers in neighboring territories. Rather, the Amended Complaint actually alleges that PepsiCo has sought to lower the prices for finished CSD products sold to national retailers for some time; and when PepsiCo is unable to set those prices itself, PepsiCo pays rebates to independent bottlers such as Mahaska so that the bottlers will offer national retailers lower prices than they otherwise would. Mahaska alleges that it is unable to provide finished CSD products to Family Dollar and others at a price at which Pepsi seeks to have finished CSD products delivered. Mahaska has not plausibly alleged any harm to competition arising from the challenged actions of Defendants, and it has not alleged that its injuries constitute antitrust injury. This alone is fatal to Mahaska's § 2 claim.

### 2. Robinson–Patman Act Claim

Mahaska also alleges that Defendants' pricing practices violate the Robinson–Patman Act, 15 U.S.C. § 13. Specifically, Mahaska alleges that Defendants have either committed predatory pricing or engaged in prohibited price discrimination. Either PepsiCo has operated PBC at a loss in delivering decreased wholesale prices of finished CSD products to retail customers, Mahaska alleges, or PepsiCo has sold concentrate to PBC at a price lower than the price PepsiCo has sold concentrate to Mahaska. Mahaska alleges

that the price of concentrate has risen by 40% over a decade, and because of this Mahaska cannot meet the prices that PepsiCo seeks to impose upon bottlers via agreements with national retailers, prices that the Amended Complaint implies PBC does meet.

The test for whether predatory pricing violates the Robinson–Patman Act is similar to the test to determine whether predatory pricing violates § 2 of the Sherman Act. Brooke Grp., 509 U.S. at 222, 224, 113 S.Ct. 2578. The Robinson–Patman Act requires a "reasonable prospect" that the defendant will recoup its investment in below cost prices, rather than the "dangerous probability" standard under the Sherman Act. Id. Even if PepsiCo and PBC are pricing below cost, the Amended Complaint does not provide a logical basis for concluding that PepsiCo could engage in sustained supracompetitive pricing if it eventually replaced Mahaska with PBC for the reasons previously stated.

■■■ With respect to Mahaska's price discrimination allegations, such a claim under the Robinson–Patman Act requires a showing of price discrimination and a resulting injury to competition. Conoco, Inc. v. Inman Oil Co., 774 F.2d 895, 901 (8th Cir. 1985). Price discrimination is where a single seller sells commodities of like grade and quality at different prices to different buyers in interstate commerce. See Texaco Inc. v. Hasbrouck, 496 U.S. 543, 556, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990). Mahaska alleges that a single seller, PepsiCo, has sold concentrate to two buyers, Mahaska and PBC, at different prices. But PBC is a subsidiary of PepsiCo, so any transfers from PepsiCo to PBC are not considered sales under the Robinson–Patman Act. See, e.g., City of Mt. Pleasant, Iowa v. Assoc. Elec. Co-op., Inc., 838 F.2d 268, 278–79 (8th Cir. 1988) ("[I]t would, in our opinion, be completely anomalous to hold, on the one hand, that the cooperative is a single enterprise which cannot conspire with itself under the Sherman Act, and, on the other hand, that the same single enterprise cannot enjoy the fruits of vertical integration by transferring goods between its constituent units at a 'price' below what it charges outsiders."). At oral argument, Mahaska argued that PBC is not a single economic enterprise because PBC also sells DPSG products and is subject to a Consent Order. But Mahaska's price discrimination claim is not about PBC's DPSG–distribution business; it is about transfers of Pepsi-brand concentrate between PepsiCo and PBC. With respect to the bottling and sale of Pepsi-brand products, it cannot be said that PBC, operating at PepsiCo's behest, possesses "diverse interests" from its corporate parent, and there is no plausible allegation that the two entities, PepsiCo and PBC, are "actual or potential competitors" in this respect either. See id. at 276, 279 (observing that transfers among vertically integrated entities are generally not considered sales under the Robinson–Patman Act).

Perhaps Mahaska can sustain a prohibited price discrimination claim under a different theory. Mahaska also alleges that PepsiCo offered certain national retailers such as Dollar General and Family Dollar prices for finished CSD products that it does not offer to other national retailers. This allegation falls within the definition of price discrimination: Defendants are alleged to have sold the same product at different prices to different buyers in interstate commerce. What this theory lacks is any allegation, let alone a plausible one, that this price difference harms competition in any relevant market. Mahaska's allegations fit the mold of what is called a "primary-line injury" claim of price discrimination. In a primary-line injury claim, a firm engages in price discrimination among its customers in order to force its competitors out of business. See, e.g.,

Brooke Grp., 509 U.S. at 220, 113 S.Ct. 2578; Bathke, 64 F.3d at 343–44.[18] Mahaska alleges that Defendants engage in price discrimination among retailers to force Mahaska out of business. Because such claims can only harm competition once competitors have left the market and the offending firm charges subsequent supracompetitive prices, primary-line price discrimination claims under the Robinson–Patman Act are evaluated according to the same standards as are predatory pricing claims. Brooke Grp., 509 U.S. at 222–23, 113 S.Ct. 2578. As this Court has already found, Mahaska has failed to plausibly allege the requisite likelihood of recoupment and thus of competitive injury.

### 3. Iowa Competition Law Claims

As stated above, Counts VII and VIII allege predatory pricing and attempt to monopolize in violation of the Iowa Competition Law, Iowa Code §§ 553.4–553.5, against both Defendants, based on the same conduct as that at issue in the federal antitrust claims. The Iowa Competition Law "shall be construed to complement and be harmonized with the applied laws of the United States which have the same or similar purpose as this chapter" and "shall be made to achieve uniform application of the state and federal laws prohibiting restraints of economic activity and monopolistic practices." Iowa Code § 553.2; accord Mueller v. Wellmark, Inc., 861 N.W.2d 563, 567 (Iowa 2015) ("[I]n the past, when interpreting the Iowa Competition Law, we have generally adhered to federal interpretations of federal antitrust law."). Thus, to the extent Mahaska's allegations fail to state a claim under federal antitrust law, as discussed above, they also fail to state a claim under the Iowa Competition Law.[19]

---

**18.** By contrast, had a retailer who competes with Dollar General made a price discrimination claim against Defendants regarding the conduct alleged herein, that would be called a "secondary-line injury" claim and the question of whether an injury to competition was pled would be evaluated differently. See, e.g., Best Brands Beverage, Inc. v. Falstaff Brewing Corp., 842 F.2d 578, 584 n.1 (2d Cir. 1987) ("A primary-line violation occurs where the discriminating seller's price discrimination adversely impacts competition with his— the seller's—competitors. In contrast, a secondary-line violation occurs where the discriminating seller's price discrimination injures competition among his customers, i.e., purchasers from him." (citations omitted)).

**19.** Mahaska's state claims are incongruous with their federal-law counterparts in one respect worth noting. Count VII sets forth a predatory pricing claim pursuant to Iowa Code § 553.4. Section 553.4 is the Iowa Competition Law's analogue to § 1 of the Sherman Act, which prohibits anticompetitive agreements. The analogue to Sherman Act § 2, which prohibits monopolization (anticompetitive unilateral conduct), is Iowa Code § 553.5, pursuant to which Mahaska pleads its state-law "Attempt to Monopolize" claim. This suggests that Mahaska's Iowa-law predatory pricing claim should be analyzed in harmony with case law interpreting Sherman Act § 1 rather than § 2. But predatory pricing claims are generally analyzed under § 2 of the Sherman Act, which prohibits unilateral conduct constituting monopolization (such as price-setting policies), not § 1, which prohibits certain anticompetitive agreements. See ZF Meritor, LLC v. Eaton Corp., 696 F.3d 254, 277 (3d Cir. 2012) (holding that predatory pricing case law interpreting § 2 is relevant where price itself forms the "predominant method of exclusion," and that rule of reason analysis under § 1 is appropriate where non-price provisions in contracts form the bedrock of plaintiff's theory of harm to competition). Nevertheless, to analyze whether predatory pricing agreements violate § 1, this Court would assess whether Mahaska has plausibly alleged that pricing-agreements harmed competition, which yields the same result as analysis above. See KLM Royal Dutch Airlines v. Amber Air Intern., Ltd., No. 89 C 4953, 1992 WL 281409, at *20 (N.D. Ill. Oct. 5, 1992); Sewell Plastics, Inc. v. Coca–Cola Co., 720 F.Supp. 1196, 1217–18 (W.D.N.C. 1989); cf. Atl. Richfield Co. v. USA Petrol. Co., 495 U.S. 328, 340, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990) ("Low prices benefit consumers regardless of how those prices are

## C. Fiduciary Duty Claim

■ Defendants argue that Count VI of the Amended Complaint fails to state a claim for breach of fiduciary duty under Iowa law because the Amended Complaint does not allege a fiduciary relationship between PepsiCo and Mahaska. Mahaska claims that Defendants possessed a fiduciary duty arising out of the EBA and Defendants' subsequent conduct and statements. Specifically, Mahaska points to the Casey Memorandum's discussion of PepsiCo assisting local bottlers and making headquarters calls "on behalf of Bottlers," as well as PepsiCo's actions in negotiating prices with national retailers. Am. Compl. ¶¶ 202–03, 206.

"A fiduciary relation exists between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." Kurth v. Van Horn, 380 N.W.2d 693, 695 (Iowa 1986) (quoting Restatement (Second) of Torts § 874 cmt. a (1979)). "A 'fiduciary relation' arises whenever confidence is reposed on one side, and domination and influence result on the other." Id. (quoting Black's Law Dictionary 564 (5th ed. 1979)). "A fiduciary relationship implies a condition of superiority of one of the parties over the other. Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary." Empr's Mut. Cas. Co. v. Collins & Aikman Floorcoverings, Inc., 422 F.3d 776, 781 (8th Cir. 2005) (emphases omitted) (quoting Kurth, 380 N.W.2d at 698).

■ The existence of a fiduciary relationship is dependent on the facts and circumstances of each individual case. Kurth, 380 N.W.2d at 696. Under Iowa law, the existence of a fiduciary relationship is ordinarily a question of fact except when the facts alleged are insufficient to find that a fiduciary duty exists. See Empr's Mut., 422 F.3d at 780 n.2 (surveying Iowa law). Indicia relevant to whether a fiduciary relationship exists under Iowa law include:

1) the acting of one person for another; 2) the having and exercising of influence over one person by another; 3) the reposing of confidence by one person in another; 4) the dominance of one person by another; 5) the inequality of the parties; and 6) the dependence of one person upon another.

Union Cty., Iowa v. Piper Jaffray & Co., Inc., 741 F.Supp.2d 1064, 1099 (S.D. Iowa 2010). Certain kinds of relationships between entities or persons are generally considered to be fiduciary relationships. Typical fiduciary relationships include those between an attorney and client, guardian and ward, principal and agent, executor an heir, and trustee and beneficiary. Kurth, 380 N.W.2d at 696.

As an initial matter, it is clear that no fiduciary duty claim can stand as to PBC. PBC is a bottler just like Mahaska. The Amended Complaint does not allege that PBC and Mahaska have any voluntary course of dealing between them, and it actually alleges that PBC is a competitor of Mahaska. The Amended Complaint alleges none of the above indicia as to PBC.

Regarding PepsiCo, Mahaska clarifies that the crux of its fiduciary duty claim arises from PepsiCo's efforts to engage national retailers with pricing agreements. In doing so, Mahaska argues, PepsiCo voluntarily undertook to represent Mahaska (and all affected bottlers) with respect to those customers. However, the Amended Complaint makes clear that PepsiCo was not in a position of dominance over Mahas-

set, and so long as they are above predatory levels, they do not threaten competition. . . .

We have adhered to this principle regardless of the type of antitrust claim involved.'').

ka. The very terms of the EBA, an agreement negotiated at arms-length between the parties, bestow on Mahaska significant agency regarding how it can deal with its customers, *particularly with respect to prices.* As alleged, these rights were reaffirmed by PepsiCo in the Casey Memorandum and in Paragraph 8 of the Omnibus Side Letter specifically regarding PepsiCo's efforts to negotiate uniform national prices. Despite PepsiCo's attempt to negotiate prices "on behalf of" bottlers, Mahaska's own allegations make it clear that PepsiCo could not bind Mahaska on prices for finished CSD products within Mahaska's territory. Far from alleging that it has put its confidence in PepsiCo, Mahaska boasts that it only participates in PepsiCo's national programs when it wants to. In Employers Mutual Casualty Co. v. Collins & Aikman Floorcoverings, Inc., 422 F.3d 776 (8th Cir. 2005), the Eighth Circuit Court of Appeals, applying Iowa law, found that statements by a party that it was working on another's behalf generally were insufficient to convert an arms-length business relationship into a fiduciary relationship. Id. at 780, 782. While "[a]cting on behalf of another may indicate a fiduciary relationship," more is needed, such as some amount of control, dependency, or asymmetric information. See id. at 781–82. As it relates to Mahaska's customer relationships, the Amended Complaint contains no such allegations, and thus it has failed to plead the existence of a fiduciary relationship and fails to state a claim for breach of fiduciary duty.

### D. Business Defamation or Disparagement Claim

In Count IX of the Amended Complaint, Mahaska alleges that Defendants have made false statements about Mahaska that have harmed its business interests. Mahaska points to Exhibit D, the internal Family Dollar communication stating that some local Pepsi bottlers refuse to meet the prices demanded by Family Dollar. Mahaska, inferring that the communication refers to itself, argues that the statement is false because Mahaska was willing to do business with Family Dollar and neither PepsiCo nor Family Dollar negotiated with Mahaska to fix any problems with Mahaska's pricing. Defendants moved to dismiss Count IX, but Mahaska did not respond in its opposition brief. Local Rule 7(f) states, "If no timely resistance to a motion is filed, the motion may be granted without prior notice." L.R. 7(f). The Court shall apply Local Rule 7(f) to the unresisted motion. Cf. Ewing v. Fed. Home Loan Bank of Des Moines, 645 F.Supp.2d 707, 708 n.2 (S.D. Iowa 2009) (applying Rule 7(f) where an opposition brief responded to only one of two dispositive motions).

Mahaska's business defamation or disparagement claim also fails on the merits. The elements of defamation under Iowa law are that a defendant "(1) published a statement that (2) was defamatory (3) of and concerning the plaintiff, and (4) resulted in injury to the plaintiff." Johnson v. Nickerson, 542 N.W.2d 506, 510 (Iowa 1996). Publication requires that the defendant communicate a statement to one or more third persons. Doe v. Hagar, 765 F.3d 855, 861 (8th Cir. 2014). The relevant question, then, is whether the internal Family Dollar communication provides a basis for Mahaska's inference that Defendants made defamatory statements about Mahaska to Family Dollar.

At the pleading stage, it is fair to make certain assumptions in Mahaska's favor given the allegations in the Amended Complaint. For purposes of the instant Motion, the Court will assume, for example, that "your local Pepsi bottler" refers to Mahaska, among others. Am. Compl. ¶ 63. The Court will also assume that PepsiCo does communicate about prices with Family Dollar in general, given that the Amended Complaint alleges that PepsiCo negotiates

nationwide pricing agreements with large national retailers, and given that another Family Dollar communication (to Pepsi distributors) refers to the "FD program." Id. Ex. G at 1. However, the allegedly false propositions are that Mahaska "was unwilling to do business to Family Dollar due to our aggressive pricing," and that Mahaska negotiated with Family Dollar regarding this. Id. ¶ 65. Even if those propositions are false when attributed to Family Dollar,[20] there is no basis to infer from the document attached to the Amended Complaint that *PepsiCo* made those allegedly defamatory statements to Family Dollar. PepsiCo is neither mentioned nor referenced in the document. Absent any indication of authorship by PepsiCo, it is worth noting that the information at issue—Mahaska's willingness to meet Family Dollar's prices, and whether Family Dollar and Mahaska have negotiated—is more likely to be within Family Dollar's knowledge than PepsiCo's. There is not enough here for Mahaska to "nudge[ ] [its] claims across the line from conceivable to plausible." See Twombly, 550 U.S. at 570, 127 S.Ct. 1955.

### E. Lanham Act Claim

Finally, Defendants move to dismiss Count X of the Amended Complaint, in which Mahaska alleges that PBC has engaged in commerce in Mahaska's territories using Pepsi trademarks, causing customer confusion and harming Mahaska's business. Count X is brought under 15 U.S.C. § 1125(a)(1), which offers a cause of action based on use of a mark in a manner in connection with goods or services in a manner that is likely to cause confusion as to the source or sponsorship of the goods or services. Davis v. Walt Disney Co., 430 F.3d 901, 903 (8th Cir. 2005). This section supports two different types of claims,

false designation of origin claims under subsection (A) and false advertising claims under subsection (B). E.g., Am. Ass'n of Orthodontists v. Yellow Book USA, Inc., 434 F.3d 1100, 1102 (8th Cir. 2006); Auto–Chlor Sys. of Minn., Inc. v. JohnsonDiversey, 328 F.Supp.2d 980, 1018 (D. Minn. 2004). Mahaska does not specify which type of claim Count X represents, but the Amended Complaint quotes subsection (A), and Mahaska's allegations of customer confusion much more closely resemble a false designation claim than a false advertising claim.

Mahaska, a company with an exclusive right to bottle and sell certain PepsiCo products, alleges that PepsiCo and PBC, PepsiCo's subsidiary, violate the Lanham Act by using certain Pepsi marks in Mahaska's territories. Mahaska does not dispute that PepsiCo owns the relevant marks. Each iteration of the EBA attached to the Amended Complaint confirms this. For example, the EBA dated August 10, 1964 states:

> [PepsiCo] is the owner of the Beverage trademark and will defend and protect same and save harmless [Mahaska] in the use of same, except for such acts as shall be the fault of [Mahaska]. Nothing herein contained shall be construed as conferring upon [Mahaska] any right or interest in said trademark, or any designs, copyrights, patents, trade names, signs, emblems, insignia, symbols and slogans, or other marks, used in connection with the Beverage.

Am. Compl. Ex. A at 10, ECF No. 25–1. In other words, Mahaska's EBA gives it the exclusive right to bottle and sell certain Pepsi-brand products, but the EBA says nothing about a situation in which another company, or PepsiCo itself, sells products

---

**20.** Regarding whether Mahaska was willing to do business with Family Dollar, Mahaska alleges elsewhere in the Amended Complaint

that it cannot meet the prices expected by Family Dollar.

not covered by Mahaska's EBA in the territories covered by the EBA. Mahaska does not allege that it possesses exclusive rights to distribute every product in the PepsiCo corporate portfolio. The EBA gives Mahaska no greater right to "wear[ ] Pepsi branded uniforms" in its territory while distributing Mountain Dew, see Am. Compl. ¶ 236, than another company (or PepsiCo itself) would have while distributing a different PepsiCo product pursuant to a different distribution agreement.

Nevertheless, the relevant provision of the Lanham Act does not on its face require that a plaintiff possess a specific ownership interest in the trademark about which a § 1125(a)(1)(A) defendant causes confusion, at least as a threshold matter. See MPC Franchise, LLC v. Tarntino, 19 F.Supp.3d 456, 476 (W.D.N.Y. 2014) ("[C]laims under ... 15 U.S.C. § 1125(a) may be brought 'by any person' who believes that they are being injured." (quoting 15 U.S.C. § 1125(a))). However, consumer confusion is the crux of a § 1125(a)(1)(A) claim, and consumer confusion cannot arise when the party allegedly causing the confusion is the owner of the mark. Westowne Shoes, Inc. v. Brown Grp., Inc., 104 F.3d 994, 997 (7th Cir. 1997) ("While a trademark licensee (at least if he has an exclusive license), as well as the trademark's owner, can sue to protect the trademark from infringement, he cannot sue the trademark owner for 'infringing' the trademark.... The owner can if he wants, unless contractually committed otherwise, abandon the trademark, dilute it, attach it to goods of inferior quality, attach it to completely different goods—can, in short, take whatever steps he wants to jeopardize or even completely destroy the trademark." (citations omitted)); see also, e.g., Twentieth Century Fox Film Corp. v. Marvel Enters., Inc., 277 F.3d 253, 259 (2d Cir. 2002) ("[T]he origin of the series (and the film), within the meaning of trademark law (i.e., the source of the goodwill inher-

ing in the trademarks that Marvel licensed to Fox), is Marvel, the owner of the marks." (internal citations and quotation marks omitted)); Auto–Chlor, 328 F.Supp.2d at 1019 ("It seems plain there can be no confusion as to origin because [defendant] was the originator of the trademark."). "[A] claim under § 1125(a) does not lie where there is no confusion about the ultimate source of the goods (interpreted to mean the owner of the mark)." MJ & Partners Rest. Ltd. v. Zadikoff, 10 F.Supp.2d 922, 928 (N.D. Ill. 1998). "Confusion" relates to "the public's belief that the mark's owner sponsored or otherwise approved the use of the trademark." Ballet Makers, Inc. v. U.S. Shoe Corp., 633 F.Supp. 1328, 1334 (S.D.N.Y. 1986) (quoting Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd., 604 F.2d 200, 205 (2d Cir. 1979)). "[C]onfusion exists only when the public believes that a product is sponsored by the mark's owner when in fact is not." Id. (emphasis omitted). In other words, the owner of a mark by definition approves its use when the owner uses the mark in commerce. As a matter of law, designation with a mark by the owner of the mark indicates that the product is the genuine product. Thus, Mahaska fails to state a claim for violation of the Lanham Act.

## III. CONCLUSION

Based on the foregoing, Defendants' Motion to Dismiss, ECF No. 28, must be **granted**.

**IT IS SO ORDERED.**